W. Banks DIEM, Plaintiff in Error,

v.

Virgil DIEM, Myril Diem, husband and wife; William L. Reno and Jeanette Reno, husband and wife; C. A. Casity and Edna Casity, husband and wife; and Rex Cruzen and Melva Dean Cruzen, husband and wife, Defendants in Error.

No. 39555.

Supreme Court of Oklahoma.

May 29, 1962.

20

T. F. Dukes, Hominy, for plaintiff in error.

Byers & Ledbetter by M. J. Ledbetter, Cleveland, for defendants in error, William L. Reno and Jeanette Reno.

John L. Arrington, Pawhuska, for defendants in error, Rex Cruzen and Melva Dean Cruzen.

John W. Tillman, Fred A. Tillman, Don Hampton, Pawhuska, for defendants in error, C. A. Casity and Edna T. Casity.

BLACKBIRD, Vice Chief Justice.

This appeal involves a disputed boundary line between two rural residential properties, or acreages, comprising a major part of the NW¼ of Section 18, Township 21 North, Range 8 East, in Pawnee County. The land lies along the northern edge of a paved road, traversed by both U. S. Highways 99 and 64, about a mile west of Clevelan, Oklahoma. It was homesteaded by plaintiff in error's father, but, a few years before he died in 1944, he agreed to divide it between plaintiff in error (hereinafter referred to as plaintiff), and another son and daughter in parcels of 33, 40, and 60 acres, respectively.

In anticipation of this division, plaintiff and his wife, together with plaintiff's son, Virgil Diem, and his wife, Myril, in 1938, moved houses from Cleveland onto the 33 acres promised to plaintiff; and established homes there. Plaintiff's house was placed more than 100 feet north of, and facing, the highway; while the younger Diems' house was placed northeast of it, at a location more than 300 feet from the highway. Instead of constructing a driveway from his house, directly south of it, and across a shallow ravine bordering the highway, for ingress and egress to and from said highway, plaintiff created a dirt, or gravel, driveway extending for a distance in an easterly direction from his house, and then curving in a southeasterly direction, and entering the highway on higher ground at a point southeast of Virgil's house. According to the testimony, plaintiff and Virgil had an understanding that the boundary line between their respective places would follow a diagonal line running northwesterly from the highway, along the east and northeast side of this driveway, until it reached a point due south of a certain point on the north line of the quarter section, before extending due north, and passing west of Virgil's house, to intersect the north line of said quarter section.

In February, 1939, plaintiff's father conveyed to him the 33 acres he promised to give him, and later, the same year, plaintiff, using his own measurements, drew up a deed to Virgil and his wife, in his own handwriting, covering a plot of ground around the latter's house and extending to the highway, for the purpose of giving them that part of the property as a Christmas present. According to the testimony, this deed was executed by plaintiff and his wife and delivered to Virgil and his wife, but was never recorded; and no one appears to know what became of it. According to plaintiff's testimony, this deed described the small acreage, which was to

belong to Virgil and his wife, in a manner that routed the boundary line between their house and his, east of the aforementioned driveway, and did not include in its grant, the strip of land said driveway traversed, or the land lying between its curve and the highway. The only deed from plaintiff and his wife to Virgil and his wife, that was ever recorded, was a typewritten one, dated December 22, 1939, covering 3¼ acres and describing same by metes and bounds in such a manner that its western boundary is a specific line running straight south from the quarter section's northwest corner, to the highway. This line bisects plaintiff's driveway, and the land lying within its curve, so that the deed purported to convey the land east of it to the grantees, the younger Diems. Despite this, plaintiff continued to use both the driveway and the land within its curve.

About the time Virgil and his wife moved to Henderson, Kentucky, in 1948, they sold their home to one William L. Reno. In the warranty deed, dated August 27, 1948, which they delivered to Reno, the boundaries of the property were described exactly as they were in the aforementioned deed said grantors obtained from plaintiff on December 22, 1939, as aforesaid.

The next Spring after Reno purchased the property (frequently hereinafter referred to as the "East Property"), he decided to build a hog wire fence to form a yard around the house thereon, with 200-foot dimensions, and caused a survey to be made of his western property line. By said survey, it was ascertained that said line bisected the aforedescribed driveway curve area, as aforesaid. Shortly thereafter, in May, 1949, Reno disclosed to plaintiff what the survey had shown, but did not personally interrupt plaintiff's use, and possession, of the driveway, or the land lying within its curve.

After subsequent conveyances of the East Property from Reno to one Rex Cruzen and his wife, and mesne conveyances unnecessary to mention, one C. A. Casity and his wife, acquired said real estate in December, 1956. (In all of these deeds, said real estate was described exactly as it was in the aforementioned one of December 22, 1939). Thereafter, these owners became involved with plaintiff in a controversy over a natural gas line that originally furnished gas for the dwellings of plaintiff, the younger Diems, and another neighbor. In the late Summer or Fall of 1959, plaintiff and the Casitys became involved in another controversy. This one involved the ownership of apricots, growing on the driveway curve area. Shortly thereafter, the Casitys had their west boundary surveyed and this survey showed the boundary line to be the same as revealed by the hereinbefore mentioned survey Mr. Reno had caused to be made. The Casitys thereupon erected a wire fence or barrier on that line; and plaintiff has ever since been deprived of the use of the ground east of said line for all purposes, including those of a driveway.

The same year (1959) plaintiff instituted, in Pawnee County's District Court, Cause No. 10829, entitled "W. Banks Diem v. C. A. Casity, et al.", in which, among other things, he sought both to establish, and to quiet, his alleged prescriptive title to, and alleged right to possession of, the aforementioned plot, from which the Casitys had barred him, as aforesaid. In the alternative, plaintiff therein sought reformation of his aforementioned deed to his son, Virgil, and his wife. This action was later dismissed, and plaintiff then instituted the present one in February, 1960, seeking similar relief, and naming Virgil Diem and the William Renos, as well as the Casitys, as defendants.

In this present action, the Casitys filed an answer and cross petition, in which they alleged, inter alia, that plaintiff's alleged cause of action was barred by the statute of limitations. Other defendants filed answers in which they denied, inter alia, that plaintiff had ever had the character, and length, of possession requisite for title, to the disputed plot, by prescription.

At the trial before the court without a jury, there was testimony reasonably tending to show (among other things already noted, and others not mentioned) that acquisition of title to the East Property by Rex Cruzen and his wife, pursuant to their purchase from Mr. Reno and his wife, was effected by a deed dated June 12, 1953; and that Mr. Cruzen rented the property, as a tenant, a year before so purchasing it. Mr. Cruzen's testimony, on cross examination, was, in part, as follows:

"Q  All right, now before you bought it, did you talk to him (Reno) about where the fence line was?

"A  That wasn't discussed until after I had bought the place. I presumed where the fence line was.

"Q  Where did you presume the fence line was?

"A  I presume  it was where the fences were. Mr. Reno had put up a new hog wire fence north of the house.

\*    \*    \*    \*    \*    \*

"Q  And after you found out there was a disputed claim, did you attempt to take any possession of that particular area where the driveway was and where there were some trees and open ground?

"A  Not any more than I had previous to that, no.

"Q  Well, in fact, you have never had possession of it at any time, have you?

"A  Oh, yes, I did.

"Q  How?

"A  I drove over it, I hauled wood over it, I hauled trash over it, and I used it at any time I wanted to.

"Q  That is this other driveway?

"A  That other driveway.

"Q  How did you get into your place?

"A  There—that driveway connected into an alley between the yard fence and the line fence.

"Q  Did you tell Mr. Diem that you were using that as your own property or just as a neighbor?

"A  I didn't think that I needed to tell him, because I had bought the land.

"Q  Well, you knew that he was making a claim to it, though, did you not?

"A  He had never made the claim to me.

"Q  Never did talk to you at any time?

"A  Not at that time, no.

"Q  Did he ever talk to you then?

"A  One time he mentioned that the line was not right, and, I told him that I had an abstract and a deed, that's what I bought and that's what I was going by; that I didn't care to discuss it with him, and that was dropped right there.

"Q  Where was it when he told you that?

"A  Oh, it was out when we were out on the place there. \* \* \*."

After the plaintiff had, in his direct examination, left the impression that he had not learned of the mistake in his 1939 deed to the Virgil Diems, until a year or less, before his commencement of this action, he was confronted on cross examination with an amendment to the petition he had previously filed in Cause No. 10829, supra, which alleged he had discovered the mistake as early as 1948. After his acknowledgment of filing of such a pleading, he was further interrogated as follows:

"Q  Now, you discovered that there was some difference between you and Mr. Reno back shortly after August 27th, 1948, did you not?

\*    \*    \*    \*    \*    \*

"I have found out since, though, I knew it was after Reno had bought it from my son, but as it happened that discovery wasn't until about May 6, 1948. Instead of being a short time

after Reno bought from my son, it was several months after.

"Q But you did have a conversation with Mr. Reno in 1949, then?

"A That was on—that was on May 6, 1949, I had a conversation with Mr. Reno."

After the evidence was all in, and the attorneys had finished their final arguments on submission of the case, the court (in accord with certain remarks from the Bench transcribed and incorporated in the case-made, but not referred to or incorporated in the journal entry of judgment) rendered a general judgment finding " * * * generally and specifically in favor of the defendants * * * " and denying plaintiff " * * * all * * * relief * * * prayed for in his petition and * * * all * * * relief prayed for in the cross petitions of each of the parties * * * ".

■ Thereafter, plaintiff perfected the present appeal from the trial court's order and/or judgment overruling his motion for a new trial. For reversal, he advances two propositions. One of his contentions, under the first, is " * * * that the court erred in holding * * * the evidence * * * insufficient to justify a reformation of his deed. * * *." He argues that the undisputed evidence of plaintiff, his son Virgil, and Virgil's wife, Myril, shows that the description contained in the aforementioned deed of December, 1939, by which the East Property was carved out of plaintiff's original 33 acres, and conveyed to the younger Diems, was not in accord with the understanding of the parties to said deed, as to the correct western boundary of the parcel intended to be conveyed. Upholding this contention, and agreeing with plaintiff as to the incorrectness of the trial judge's oral remark from the Bench that plaintiff had not discharged his burden of proof on that point, would avail plaintiff nothing under the circumstances. Such remarks are not effective to reverse such a judgment. See In re Warwick's Estate, Okl., 291 P.2d 346, and Miller v. Young, 197 Okl. 503,

172 P.2d 994. As to related matters, see also Hays Trucking Co. v. Maxwell, Okl., 261 P.2d 456. If the judgment appealed from may be upheld on any theory plead and proved, it must stand. See Mahan v. Dunkleman, 205 Okl. 54, 234 P.2d 366, and other cases digested in 2A Okl.Dig., "Appeal & Error", ☞ 854(2). As hereinbefore shown, plaintiff admitted, while a witness, that he learned of the alleged mistake in the deed at least as early as May, 1949. The proof thus upholds defendant's theory that the statutory limitation period barred his alleged cause of action for reformation of said deed. See Maloy v. Smith, Okl., 341 P.2d 912, 917.

■ Nor does plaintiff's contention that the trial court's judgment is also contrary to, or against the clear weight of, the evidence as to his alleged cause of action for prescriptive title, demonstrate reversible error. As hereinbefore shown, there was testimony reasonably supporting the conclusion that before the fifteenth anniversary of the commencement of plaintiff's possession and use of the plot of ground involved, it lost its exclusive character and became, and remained thereafter until he was finally barred therefrom, a mixed, or shared, possession and use. That character of possession is not sufficient for prescriptive title purposes. See Howard v. Stanolind Oil & Gas Co., 197 Okl. 269, 169 P.2d 737, 744; Annotation, 170 A.L.R. 838, 845ff; and 1 Am.Jur., "Adverse Possession", section 141ff. It is our opinion, after carefully examining the record, that the trial court's judgment to the effect that plaintiff's possession did not have the requisites of prescriptive title for the full 15-year period, cannot be held clearly against the weight of the evidence, or contrary to law.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

WILLIAMS, C. J., and DAVISON, HALLEY, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.