V. M. THOMPSON, Jr., as Executor of the Estate of Clyde Bruce McNeill, Deceased, Plaintiff in Error,

v.

J. H. INMAN, Jr., and Betty Jean Inman, Defendants in Error.

Betty Jean INMAN, Plaintiff in Error,

v.

V. M. THOMPSON, Jr., as Executor of the Estate of Clyde Bruce McNeill, Deceased, Defendant in Error.

Nos. 42454, 42459.

Supreme Court of Oklahoma.

March 23, 1971.

Thornton, Stamper & Dalton, Tulsa, for V. M. Thompson, Jr., as Executor of Estate of Clyde Bruce McNeill, Deceased.

Eph Monroe, and Arney & Arney, Weatherford, for J. H. Inman, Jr. and Betty Jean Inman.

WILLIAMS, Justice.

This case involves a controversy over the ownership of a 160-acre tract of land with improvements thereon, in Douglas County, Nevada, described as:

East Half (E/2) of the Southwest Quarter (SW/4) and the West Half (W/2) of the Southeast Quarter (SE/4) of of Section 17, Township 12 North, Range 21 East.

The land was homesteaded by J. H. Inman, Jr., and his wife, Betty Jean Inman, after they moved to Nevada from the vicinity of Thomas, Oklahoma, in 1956. Inman had been reared on a farm north of Thomas, where he was well acquainted with Clyde B. McNeill, who later became the owner of that town's C. B. McNeill Grain Company. For a short period after he was discharged from military service, apparently with some undescribed disability, in 1951 or 1952, Inman trained horses for McNeill.

For the purpose of residing with his family on the above described Nevada land during the seven months of one year required of disabled veterans (in lieu of the three years required of others) to obtain a homestead patent, Inman built a three-room cabin there. During at least a part of the time that the Inmans were in Nevada, Betty Jean worked for that State's Industrial Commission at Carson City, and established a bank account in her individual name in said city's branch of the First National Bank of Nevada.

In 1959, Inman obtained title to the Nevada homestead by patent from the United States, and listed said property for sale with one Matheus of the Carson City Realty Company. Soon thereafter, at least part of the Inman family returned to Oklahoma, and Betty Jean became employed by the aforementioned C. B. McNeill Grain Company as a bookkeeper.

About this time, McNeill was interested in acquiring from the U. S. Government in Nevada what was termed "desert-entry land". According to Inman's testimony concerning the rules and regulations governing such acquisitions, if a person owned as much as 80 acres of land adjoining desert-entry land, he could make application to the Government to sell at public auction 720 acres of said desert-entry, non-isolated land, and, if his application was approved, he could then purchase it at the highest bid submitted at a public auction sale, which (at the time involved) usually ranged from $3.00 to $10.00 per acre. It may also be gathered from Inman's testimony that the landowner, who first established his right to the water under it, had priority to its use over those owning adjoining land overlying the same underground water supply. As Inman's homestead had the necessary area to qualify him for the purchase of two 720-acre tracts of desert-entry land, he and McNeill devised a scheme through which they hoped that, by Inman's ostensibly sharing his ownership with McNeill, they could each qualify for the purchase of one such tract. Accordingly, they signed a witnessed, but undated, typewritten agreement entitled "Purchased Option", which reads as follows:

"This agreement between J. H. Inman seller party of the first part and C. B. McNeill buyer party of the second part seller agree that second party will endorse note to the bank in which the proceeds will be received by the first party. This in effect being a loan on 80 acres of land located in Nevada described as NE 40 of the SW ½ and the NW 40 of the SE ¼ Section 17 T 12N R21E Douglas County.

"Both parties will endeavor to purchase an additional 720 acres each from Federal Government adjoining each 80 they now own. If successful second party will pay the Government up to $3.00 maxim per acre. In this event also will pay first party $2,000.00 bonus for this 720.

"If not successful second party will have option to purchase 80 acres described above for 5,000 consideration. If first party did not pay above note and was paid by second party this amount would be deducted from 5,000 purchase price. If Option was refused then first party will have one year to sell and repay the $2,000 to second party.

"First party agrees to give second party first mortgage on above described 80 acres."

By 1961, the aforementioned Nevada real estate broker, Matheus, had been unable

to sell the subject real estate for the price Inman desired, and it had apparently been taken off of the market. Inman and McNeill then proceeded with their efforts to use it to obtain desert-entry land.

McNeill died on October 7, 1965, and, in less than three weeks thereafter, the County Court of Custer County appointed a Stillwater man, V. M. Thompson, Jr., as the executor of his estate.

During the next month thereafter, Inman made a trip to Nevada to see Matheus again and listed the subject property for sale at the reduced price of $250.00 per acre. Sometime during the following month, Matheus sold it to a California client, Mr. Satcho, and his three partners, Palmer, Cage, and Thompson, in parcels of 40 acres each, for a total price of $40,-000.00. By the terms of the sale, these buyers were each to pay $10,000.00, $5,-500.00 of which was to be in cash. Deeds were put in escrow to be delivered to them by the Title Insurance and Trust Company of Carson City. Thereafter, a sum approximating $22,000.00 was paid to said Company on the purchase price by the named purchasers; and said Company, pursuant to its instructions, deposited the money in Betty Jean Inman's aforementioned Carson City bank account, from which it was thereafter paid to the Inmans by checks drawn on said account.

In the meantime, the McNeill estate's executor, Thompson, hereinafter referred to as "plaintiff", came into possession of an instrument purporting to be a warranty deed dated June 12, 1961, from Inman and his wife, Betty Jean, to the same 160 acres, and he caused it to be filed for record in Douglas County, Nevada, on December 31, 1965.

After plaintiff discovered that deeds conveying the same land from the Inmans to the above named California purchasers had been filed for record a few days before the latter one, he instituted the present action against Mr. and Mrs. Inman, hereinafter referred to also as "defendants". In addition to alleging that defend-

ants sold the subject Nevada real estate to McNeill as evidenced by the above described 1961 deed (a copy of which he attached to his petition) and that defendants had subsequently resold the same real estate to the above named California purchasers, plaintiff's petition conceded that the latter were probably bona fide purchasers for value without notice, but further alleged that, at that time, Inman was not the owner of the property and that the sale to the California purchasers was made pursuant to a conspiracy and scheme of the defendants to defraud McNeill's estate of the property, its ownership and the benefits thereof. Plaintiff also alleged, among other things, that the reasonable value of the real estate involved is $1,000.00 per acre and that the "fraudulent activities of the defendants" in dealing with it as alleged has resulted in damage to plaintiff in the amount of $160,000.00. Plaintiff prayed for judgment against defendants in that amount as actual damages, and for the further sum of $100,000.00 in exemplary damages, and for other relief not necessary to describe.

In his answer, the defendant admitted that he signed the deed relied on by plaintiff, but he alleged, in substance, that he did so at McNeill's request, and without consideration (pursuant to the parties' hereinbefore described scheme) to make it appear that McNeill was the owner for the purpose of qualifying him to purchase desert-entry land, and for no other purpose, and with the further agreement that McNeill would not put the deed on record until their applications for such land were approved, and that then he would deed the property back to Inman. The answer further alleged that, after the parties' agreement was made, the United States froze all purchases of such Government land, and that the deed should have been returned or destroyed, which defendant thought had been done, and which would have been done, had McNeill lived. This defendant further alleged that he signed the deed at 2 A.M. in McNeill's basement without a Notary Public being present,

and that his wife, Betty Jean, did not sign, nor know about this deed.

Defendant, Betty Jean Inman, filed a separate answer, joined with a cross-petition, in which she denied the allegations of plaintiff's petition and denied specifically that she placed her purported signature on the 1961 deed attached to plaintiff's petition, and alleged that it was a forgery, and was made without her knowledge or consent, and not before any Notary Public. In her cross-petition, this defendant sought to state a cause of action for malicious prosecution against plaintiff by the following allegations:

"I

"That the plaintiff filed this alleged cause of action against the defendant, for which there was no legal ground, factual or otherwise, upon which to base a valid allegation in favor of plaintiff as against this defendant.

"II

"Plaintiff, at no time, had a legal cause of action in which he would be entitled to judgment as against the defendant, Betty Jean Inman. These facts were at all times known to the plaintiff, but regardless, the case was filed; the plaintiff further knew that since the defendant had worked for the plaintiff that the signature upon the purported conveyance was not the signature of Betty Jean Inman, and that the agents, servants, and employees, and attorneys for the plaintiff herein have been so advised since the filing of this action.

"III

"Said case, and allegations as published, were made maliciously and were made to harass the defendant; and that on several occasions, the Clinton Daily News, a newspaper in Custer County have carried a notice of this case having been filed, with the allegation that this defendant was guilty of fraud and that further this defendant with another party conspired and schemed together to defraud the estate of McNeill and alleged that this defendant did wrongfully obtain benefits by said scheme and conspiracy and by fraud."

Mrs. Inman further alleged: "* * * that as a direct and proximate result of the filing of the action * * * by * * * plaintiff, this said defendant has been caused injury to her reputation, character and income, all to her damage of Eighty Thousand Dollars ($80,000.00)."

At the trial, plaintiff, in an apparent effort to refute Inman's allegation that the aforementioned deed to McNeill dated June 12, 1961, was without consideration and to show that a greater cash consideration was given for it than the "Ten Dollars * * *" typewritten into the deed form's blank as such consideration, called as his witness one Benny Chambers. Chambers testified that he had been employed as the manager of the C. B. McNeill Grain Company since February of 1960; that he was the same person who signed the name "Ben Chambers" as one of the two witnesses to the signing of the Purchase Option agreement and that said (undated) agreement was entered into "approximately February of 1961, as I recall * * *" and that that was the approximate date of the note referred to therein. This witness further testified that (in his position) he had been responsible for the maintenance of the records and books concerning McNeill's real estate and farms; and he identified certain written evidences of expenditures that had been made from various McNeill bank accounts in the American State Bank of Thomas, as having been found among those records. These were introduced as Plaintiff's Exhibits Numbered "5" to "14", both inclusive. The 7th of these exhibits was a cancelled check dated that same date as the McNeill deed (June 12, 1961) signed by McNeill and made payable to "J. H. Inman and Betty Inman" in the amount of $2,900.00. The 9th of these exhibits was a page of check stubs, one of which appeared to match this check. In the spaces provided on the stub for writ-

ing what the check was "FOR", there had been written, by someone's hand, the following:

"Final payment
Nevada Real Estate
E/2 of SW/4 & W/2 of SE/4
Sect. 17, T 12N, R21 East
Douglas Co."

Plaintiff's Exhibit 5 is a draft dated March 14, 1960, made payable to "Mr. Bob Meyers" in the amount of $1,425.01, drawn by J. H. Inman, Jr., appearing to have been paid from the C. B. McNeill Farm Account in the Thomas bank. Plaintiff's Exhibit 6 is a draft dated the same date (March 14, 1960), made payable to a Mr. Robert L. Pruett in the amount of $2,806.-42, also drawn by J. H. Inman, Jr., and appearing to have been paid from the same account. Witness Chambers testified that Mrs. Betty Jean Inman had told him that this payment was made for the house on the (Nevada) land. Plaintiff's Exhibit 8 is a check dated October 23, 1962, in the amount of $1,916.93, made payable to Thomas' American State Bank and drawn on the C. B. McNeill Farm Account by the witness, Chambers. In its lower left-hand corner, this check bears the notation: "Inman Land." Chambers testified, over the objection of the defendants, that he wrote this check for McNeill to pay off the balance due on a two-thousand dollar note to said Bank, signed by Inman and endorsed by McNeill. Plaintiff's exhibits numbered "10" to "14", both inclusive, are cancelled checks dated January 15 and April 23 in 1962, and June 26, 1963, July 29, 1964, and June 21, 1965, respectively, signed by Chambers and others (including Mrs. Inman) and drawn on the C. B. McNeill Farm Account in the aforenamed Thomas bank, payable to the Douglas County Treasurer. The witness, Chambers, testified that these checks were drawn to pay ad valorem taxes on the subject land.

When the defendant, Inman, was interrogated concerning plaintiff's above described exhibits, he testified that after he had received his homestead patent to the subject land and McNeill had had two other men file for two half sections of desert-entry land for him, and McNeill had filed for another half section adjoining the subject land, McNeill telephoned the witness in Nevada and told him that before he invested "all that money" in such land and "risked the government taking all of it back" because he had not "appropriated" the water as required to retain the land @ $3.00 per acre, he would pay the expense of drilling a well on Inman's homestead "to find out how the water [in that area] was." He further testified that such a well was drilled by Meyers Drilling Company and that it cost a total of "about $4,700.00." He further testified that the driller, Mr. Meyers, took in the Inman's twenty-nine-hundred-dollar automobile on this cost and that plaintiff's aforementioned Exhibit 7 was the check McNeill wrote to reimburse the Inmans for it. He further testified that plaintiff's Exhibit 5 was the draft drawn on McNeill to pay the unpaid balance due on the well drilling contract. Inman further testified that, before he drew the draft introduced in evidence as plaintiff's Exhibit 6, he and McNeill had been unsuccessful in one application for desert-entry land because "it wouldn't pass requirements for agriculture" and they became rather disgusted with their venture, so the witness sold the subject land to a "rancher down in the valley" named "Pruett" for $10,000.-00. He further testified that after Pruett had paid $2,800.00 on this purchase price "he had some financial difficulties and decided he would like to get his money back and get out of the deal." The witness further testified, in substance, that (about this time) McNeill had decided he would renew his efforts to get desert-entry land "another way" and that, when he told him that Pruett "wanted out" of his purchase, McNeill said: "Let's pay him off", and that this was done by the draft introduced in evidence as plaintiff's Exhibit 6. Inman further testified that in 1962 "the desert wasn't doing me no good" and that he was wanting to buy a farm near Weatherford, but McNeill said: "Let's ride it a

little longer to see if I can get that [Nevada] land bought", and also said: "I will sign a note for you at the bank for $2,000.00 and when it comes due I will pick up the note." The witness stated that the McNeill Farm Account's check to the Thomas bank, introduced as plaintiff's Exhibit 8, was given to pay the balance due said bank on that note. A later excerpt from this witness' direct examination is as follows:

"* * *

Q. Let me ask you this Mr. Inman: Plaintiff's Exhibit No. 1, which purports to be a Warranty Deed from yourself and your wife to Mr. McNeill to this quarter of land, is that your signature upon the deed?

A. Yes, it is.

Q. Is that your wife's signature?

A. No, it isn't.

Q. Do you recall signing the deed, or whether or not you signed that particular deed?

A. This is my signature and I remember signing a blank one to be filled in later.

Q. Did you ever at that time or any other time Mr. Inman, did you ever sell Mr. McNeill any land, agree to sell him any land for an agreed price? Have you ever agreed to sell Mr. McNeill any land?

*    *    *    *    *    *

A. The answer is no.

Q. Mr. Inman, are you familiar with that instrument, Plaintiff's Exhibit No. 2, which indicates what is entitled a Purchase Option between you and Mr. McNeill?

A. Yes, I do.

Q. Do you recall signing that document?

A. Yes.

*    *    *    *    *    *

Q. Was there any particular agreement as you recall between you and Mr. McNeill at the time you signed this, as to why it was being signed?

A. Yes.

Q. What, if you recall, was the occasion and the reason for making such an agreement?

MR. THORNTON: Your Honor, we are going to object for the purpose of the record. Any testimony with respect to this agreement, or respect to the deed for two reasons: First of all, the deed speaks for itself; and, in violation of parol testimony if he contends this is not a valid conveyance, and was not conveyed from him to McNeill. It would then have to be in writing.

THE COURT: I think if you can establish when and where this instrument was entered into, it will be overruled.

MR. THORNTON: Exception.

*    *    *    *    *    *

Q. Now, in as much as perhaps this agreement is not quite clear, could you tell the court what you understood the meaning of this so-called Option—Purchase Option, what it means?

MR. THORNTON: We object to any testimony with respect to his interpretation of this agreement, because the instrument speaks for itself; unless that court is going to first rule as a matter of law it is ambiguous.

THE COURT: I am going to rule it is ambiguous, and the objection is overruled.

MR. THORNTON: Exception.

Q. Did you and Mr. McNeill have a conversation pertaining to the transactions embodied in that instrument?

A. Yes.

Q. What, may I ask, was your understanding of yours and Mr. McNeill's agreement as supposedly set forth there?

A. Well, now we finally run onto a deal where we could buy government land. In order to buy government land you had to buy adjoining land; I had adjoining land. One person could only buy 720 non-isolated, if it was isolated you could get up to 1500. This was

non-isolated, so I was only eligible for 720 acres. If it is approved then it is put up for auction, and the person who puts the land up for sale in 30 days he has the option to take the land at the highest bid. In order to do so the land would go from $3.00 to $10.00 an acre, that is what government land was costing.

Clyde, he wanted more than that. That is the reason for this, and the way we divided it there Clyde would have half of it and I would have half of it. He was going to buy 720 and I' was going to have 720, this would be to prove or show the government something that he owned some land. * * *"

With obvious reference to plaintiff's hereinbefore described Exhibits numbered 10 to 14, both inclusive, showing that the ad valorem taxes on the subject property for the years 1961 through 1964 were paid by checks written by various individuals on the C. B. McNeill Farm Account, the defendant Inman testified that it was part of his arrangement with McNeill that McNeill would "pay all expenses including taxes."

After another witness, and Betty Jean Inman, had given testimony, which included corroboration of her husband's denial that she signed the Inman-McNeil_ deed, and supporting their pleadings that the writing of her name on it was a forgery, both parties rested, and plaintiff challenged the sufficiency of the evidence to support Mrs. Inman's cross-petition and moved for a directed verdict. When these were overruled and the case was submitted to, and deliberated upon by, the jury under instructions given by the court, two verdicts were returned. One of these was in favor of defendants on plaintiff's petition. The other was for Mrs. Inman on her cross-petition, and fixed the amount of her recovery against plaintiff at $40,-000.00.

Thereafter, the court first entered judgment in accord with both verdicts, but later sustained plaintiff's motion for judgment notwithstanding the verdicts only as to the verdict on Mrs. Inman's cross-petition. The court overruled said motion, as to the verdict in favor of defendants on plaintiff's petition. The court also overruled plaintiff's motion for a new trial. Thereafter, Mrs. Inman filed a motion for a new trial, directed at the judgment denying her recovery on her cross-petition, and, from the court's order overruling it, lodged the appeal appearing in the caption of this opinion as this Court's Cause No. 42,459.

Plaintiff lodged a separate appeal from the court's order and/or judgment overruling his motion for a new trial and motion for judgment notwithstanding the verdict, as to the cause of action alleged in his petition. This appeal appears in the above caption as this Court's Cause No. 42,454, and in it defendants have filed a cross-petition in error.

The two appeals have been consolidated for briefing and will herein be treated as consolidated for decision by this Court.

In Cause No. 42,454, plaintiff first contends that the trial court's overruling of his aforementioned motion for judgment in his favor, notwithstanding the jury's verdict against him on his alleged cause of action against defendants (and said court's overruling of his motion for a new trial), constituted error because the verdict and judgment, as to that cause of action, are not supported by the evidence. In support of this contention, plaintiff recognizes defendants' position that the Inman-McNeill deed never became operative as a conveyance of the subject land, and concedes that if the evidence supports them in this, his alleged cause of action cannot be upheld. On this premise, plaintiff argues that the defense in this action is, by its nature, the same kind of a cause of action upon which cancellation of deeds is usually sought. Following this, he argues that the same character of evidence should be necessary to support the verdict and judgment against him as is required, in deed cancellation cases, to overcome the presumptions accompanying

a deed that, on its face, appears to be a valid conveyance.

■ We find no merit in plaintiff's argument under his PROPOSITION I. We have carefully examined the evidence as a whole, including that pertaining to matters not hereinbefore narrated, and cannot say that there was no competent evidence reasonably tending to support defendants' position that the deed relied on by plaintiff was not a conveyance in praesenti, nor was intended to become operative as a conveyance of the land described therein on, or before, or after Clyde B. McNeill's death. Although it is clear that, after the Inmans homesteaded the 160 acres, more than the five-thousand-dollar figure, mentioned in the hereinbefore quoted Inman-McNeill Purchase Option as the "consideration" for the option to purchase the *80* acres referred to therein, was expended out of McNeill funds for purposes having some relation to Inman's ownership of said property, still there is evidence (including the testimony of Inman that at the time of McNeill's death, the latter had an application pending for desert-entry land, of whose rejection notice was not received until after his death) from which the jury was warranted, under the court's instructions, in concluding that, when McNeill died, no such option, as the one referred to in the Purchase Option Agreement, had ever been exercised. In the court's instructions, to which no objection was interposed, nor changes or additions requested (as far as the casemade reveals) we find that the court told the jury (by its Instruction "No. 5") that the plaintiff had the burden of proving, among other things, that Inman *sold* the subject property to McNeill for a good and valuable consideration and that the deed in question was executed and delivered *for that purpose*. Evidently the jury determined that plaintiff did not discharge this burden. In view of the circumstances of this case (including the facts that the plaintiff, himself, introduced parol evidence to vary the deed's recital as to the cash consideration given therefor, and that he later allowed the case to be submitted to the jury without any instruction as to the character of proof necessary to overcome the presumptions which, he contends, accompany such instruments) we apply the rule which was applied to the presumption involved in Shelden v. Shinn, 206 Okl. 69, 239 P.2d 803; and hold that, whether or not the evidence in this case was sufficient to overcome the presumption that the deed involved here was a valid conveyance, was a question for the jury's determination. Here, as in that case, the evidence as to whether the deed was intended as the conveyance it purported to be, was conflicting. Therefore, in view of the above, and in accord with the second paragraph of the syllabus in the cited case, we hold that the trial court committed no error in refusing to disturb the verdict and judgment as to plaintiff's cause of action, by overruling his motion for judgment notwithstanding the verdict.

Under his PROPOSITION II, plaintiff complains that the trial court erred in allowing defense counsel to elicit inadmissible testimony from their clients and from plaintiff's witness, Chambers, as to the signatures on the Inman-McNeil_ deed he relied upon.

In one of these complaints, plaintiff cites page 244 of the casemade, in support of his charge that the defendant, J. H. Inman, Jr., was permitted to testify, *over his objections,* that the challenged deed had been signed by him in blank. The cited page is the one containing the hereinbefore quoted answer of this witness as follows: "This is my signature and *I remember signing a blank one* to be filled in later." (Emphasis added.) A careful review of the record of this portion of said witness' testimony reveals no such objection, as plaintiff's brief represents.

Another of plaintiff's complaints concerns the following portion of witness

Chambers' cross-examination about said deed:

"Q. Now this deed that is here, was it kept in that office?

A. Yes.

Q. Was it completely filled out all the time it was in the office?

A. I don't know.

MR. THORNTON: The deed speaks for itself. There is no question about it. It is not in their pleadings, and this is the first time I ever heard of it.

Q. Was the deed in the same condition it is now? If you know?

THE COURT: Overruled.

MR. THORNTON: Exception.

A. Restate what you mean?

Q. The deed that you hold in your hand is it other than the filing markings, the substance part of the deed, is it the same now as when it was in your file up in your office?

A. Yes, as far as I know it was.

Q. And did you have any instructions about filing the deed for Mr. McNeill?

A. No, I did not. * * *"

In plaintiff's final complaint about the admission of testimony concerning the deed's signatures, he says that the defendants should not have been allowed to testify that Betty Jean Inman's purported signature was not hers, because, under Nevada law, a wife's signature is not required on a conveyance of such land, and therefore it is immaterial whether Mrs. Inman signed the deed or not. The casemade reveals that Inman testified that his wife did not sign the deed, without any objection being made on behalf of plaintiff. The only objection, this record shows, to Mrs. Inman's testimony on this subject, is the one appearing in the following excerpt from her direct examination:

"Q. I will hand you what has been marked Plaintiff's Exhibit No. 12 and ask you to state what that is? * * *

A. My signature card at the First National Bank at Carson City.

Q. Is that your signature on that card?

A. That is right.

Q. Mrs. Inman, I will hand you what has been marked Plaintiff's Exhibit No. 1, and ask you to examine the signature on there that purports to be that of Betty Jean Inman, and ask you to state whether or not that is your signature?

A. That is not my signature.

Q. Did you or have you ever at any time ever signed a deed or what purports to be a deed to Clyde McNeill?

A. I have not.

* * * * * *

Q. Would you examine these two signatures to be sure now. You know your own signature?

A. I am not a handwriting expert either, but I know my own signature. This is not my signature, this one is. (indicating) This signature was written in 1960.

MR. THORNTON: May we have a continuing objection to this line of testimony?

THE COURT: Yes. * * *"

■ As will be noted from the hereinbefore quoted testimony of the witness Chambers, it in no way reflected upon the genuineness of the deed plaintiff relied upon; and plaintiff demonstrates no prejudice from its elicitation. Under this State's harmless error doctrine, the admission of evidence, if not prejudicial to the complaining party, is not ground for reversal. Kimmell v. Goehler, 99 Okl. 273, 222 P. 576. See also St. Louis-San Francisco Railway Company v. Powell, Okl., 385 P. 2d 465, 469.

■ We have already indicated that the record shows no objection upon which to predicate error in the admission of Mr. Inman's testimony that his wife did not sign the questioned deed. We think it is almost equally clear that the same may be said of the admission of Mrs. Inman's above-quoted testimony. In McMillan v. Lane Wood & Company, Okl., 361 P.2d

487, we held that it is the duty of a party, who thinks the trial court has erred against him, to call this to said court's attention. And, in Parris v. McCallay, Okl., 424 P.2d 62, 67, we demonstrated that this must be done promptly, or, as their said concerning admissions of objectionable evidence, "at the time these things occur." We further said:

"An attorney cannot sit idly by until afterward, and then make a vague, general objection that may leave both the trial court and the appellate court in doubt as to just what the objection is directed and as to the proper, or precise, ground upon which it is based."

Here, as will be noted from the above quoted excerpt from Mrs. Inman's direct examination, plaintiff's counsel sat idly by, while her own attorney elicited from her answers to questions obviously designed to convey to the jury the information that she had never signed the questioned deed, without interposing any objection either to said questions or answers, until after the jury had heard them, and then, as will be noted, he merely asked the trial judge a question that contained no clue as to the ground, if any, upon which such testimony might be inadmissible. If plaintiff's counsel was serious in his objection, he should not only have revealed to the court the ground upon which he considered it inadmissible, but as we noted in Parris, supra, that the plaintiff in Garret v. Lacquement, Okl., 306 P.2d 696, did not do, he should have moved the court to strike Mrs. Inman's answers and to instruct the jury to disregard them.

In accord with the foregoing, we hold that, under the circumstances, plaintiff's present attempt to interject into this appeal the question of the admissibility of all of the testimony of which he complains, must fail.

■ Nor will we disturb the trial court's order and judgment overruling the motion of the defendant, Betty Jean Inman, hereinafter referred to as "cross-petitioner", for a new trial, of which said ruling she complains in her appeal hereinbefore referred to as Cause No. 42,459. In her arguments to show that this was error, she contends that said court vacated its previous judgment (based on the jury's verdict awarding her $40,000.00 in damages against plaintiff) and sustained plaintiff's motion for a judgment exonerating him from liability, notwithstanding the verdict, for the reasons she says he stated in oral remarks from the bench at the time he announced his said ruling. Without quoting these remarks, as they were represented in Mrs. Inman's motion for a new trial, we think it sufficient to say that, assuming they were made and that they accurately reflected the court's reasons for his ruling, since they were not incorporated in the journal entry of said ruling, they cannot be made a basis for reversing it (see Diem v. Diem, Okl., 372 P.2d 19, and the cases there cited) ; and we must affirm the trial court, if said ruling is sustainable on any valid ground, not inconsistent with plaintiff's position. See Seal v. Carroll, Okl., 439 P.2d 185, Mitchell v. Lindly, Okl., 351 P.2d 1063, 1066, and other cases digested in 2A Okl.Dig., "Appeal and Error",

■ Such ground, in this case, is that the cross-petitioner failed to discharge her burden of proving want of probable cause, on plaintiff's part, for naming her a co-defendant (with her husband) in the petition he filed in this action, and for charging her (by use of the collective term "defendants" in certain of said petition's allegations) with being a part of a conspiracy and scheme, alleged therein, to defraud the Clyde McNeill Estate of the ownership, and benefits of ownership, of the subject Nevada land. (As to such burden of proof, see Miller v. Bourne, 208 Okl. 362, 256 P.2d 431, and 52 Am.Jur.2d, Malicious Prosecution § 130.)

It has never been suggested in this case that plaintiff lacked probable cause for charging the defendant, J. H. Inman, with conspiracy to defraud the McNeill Estate of said land, or the benefits of its ownership, including the right to the proceeds of

its sale. We therefore take it to be tacitly conceded that if, at the time plaintiff filed this action, he had ground for reasonably believing cross-petitioner was associated with her husband, in such a conspiracy, he had probable cause for naming her as a "defendant" in the action and for including her within the frame of reference to "defendants" in his petition's allegations connecting the Inman couple (collectively) with the alleged defrauding of the McNeill Estate of what, on the basis of the deed in controversy and other hereinbefore mentioned documentary evidence, appeared to be property that the testator, Clyde McNeill, had acquired.

Proceeding from this premise, the question then becomes: Was the evidence sufficient to show that, when plaintiff instituted this action allegedly causing (upon publication of this fact in the Clinton newspaper) the alleged damages to cross-petitioner's reputation, character, and income, he lacked probable cause for believing she was a party to the fraud with which plaintiff's petition also charged her husband? In our opinion, the evidence does not establish such want of probable cause. Whether the cross-petitioner's signature on the 1961 deed was necessary under Nevada law to a valid conveyance of the land therein described (which cross-petitioner denies) or not, the presence on the deed of what might be reasonably assumed to be her signature, together with the Nevada bank records showing proceeds of the land sale to the California parties were deposited in cross-petitioner's Nevada bank account, in view of all the other facts and circumstances in this case, was reasonable ground for concluding that cross-petitioner had a part in planning this latter transaction, to the detriment and loss of the McNeill Estate.

One fact testified to by the witness Chambers, bookkeeper for the McNeill interests, with reference to payment to the Douglas County, Nevada, Treasurer, of taxes due on the lands here involved, annually, by checks drawn on the C. B. McNeill Farm Account in the American State Bank of Thomas, Oklahoma, was that: "On one occasion Mrs. Inman was not working for us at the time, however, she brought a statement by and stated that this was no longer theirs, they no longer owned this land and that Clyde McNeill paid the taxes on this place." Further, she herself signed for Mr. McNeill the June 21st, 1965, check to such Treasurer in the amount of $31.58 marking it, "J. H. Inman, Jr., 1964–65 taxes."

Except for the described purported acknowledgement, it is undisputed that cross-petitioner's purported signature on the 1961 deed was not, in fact, hers. However, the aforementioned witness, Chambers, who testified that he had known cross-petitioner's signature all of the time she worked for the McNeill Company, also testified that he could not tell whether the signature on the deed was in the same handwriting as that on the above-described McNeill check that was introduced in evidence as one she had written to pay taxes on the subject land. The purported signature on the deed does not differ from her signature, as an endorser of McNeill's hereinbefore mentioned Twenty-Nine-Hundred-Dollar check (of the same date) to her and her husband (Plaintiff's Exhibit No. 7) enough to constitute reasonable cause for doubt as to its genuineness, in view of the prima facie evidence of the deed's execution furnished by the acknowledgement thereon signed and sealed by a duly commissioned Notary Public (see Dyal v. Norton, 47 Okl. 794, 150 P. 703, 3rd syll.) even though (as her counsel represents) she had placed her signature on other papers and documents before and after plaintiff's appointment as the McNeill Estate's executor (October 26, 1965) and before cross-petitioner voluntarily terminated her employment with the McNeill interests (June 1, 1966).

Therefore, even though cross-petitioner testified, without direct contradiction, that she knew nothing of her husband's sale of the Nevada land to the California parties, until after payments on said sale's

price were placed in her Carson City bank account, we have no hesitancy in concluding that, on the basis of the circumstantial, direct and documentary evidence in existence at the time the plaintiff executor instituted this action, he had probable cause to believe that cross-petitioner, as well as her husband, were involved in a scheme to deprive the McNeill Estate of the Nevada land, which appeared to have been conveyed to the testator, Clyde McNeill.

■ There is no evidence that, at the time he filed this action, plaintiff had independent knowledge, or information, sufficient to put him upon inquiry as to the genuineness of cross-petitioner's purported signature on the 1961 deed, or to impugn his good faith in regarding it as genuine, and taking legal action accordingly. Cross-petitioner's suggestion that, if plaintiff had inquired of her, he could have learned that she did not sign that deed, is irrelevant and unworthy of consideration on the issue of probable cause.

■ As the facts, about plaintiff's probable cause, or want of it, were undisputed, the trial court should have determined this issue in plaintiff's favor without submitting it to the jury. See Miller v. Bourne, supra, and other cases discussed in the annotation at 87 A.L.R.2d 184, 188ff. As said court did not do so, but, instead, overruled plaintiff's motion for a directed verdict as to the cross-petition, he committed no error in subsequently curing this error by sustaining plaintiff's motion for judgment, notwithstanding the verdict in cross-petitioner's favor.

In accord with the foregoing, the trial court's order and judgment overruling plaintiff's motion for a new trial on his alleged cause of action and overruling the motion for a new trial of the defendant, Betty Jean Inman, on the cause of action alleged in her cross-petition, are both hereby affirmed.

BERRY, C. J., DAVISON, V. C. J., and BLACKBIRD, JACKSON, IRWIN and LAVENDER, JJ., concur.