1997 OK 152

**Eric PICKENS, Plaintiff–Appellant,**

v.

**TULSA METROPOLITAN MINISTRY, an Oklahoma Corporation; and Olsen Coffey Architects, an Oklahoma Corporation, Defendants–Appellees.**

No. 89540.

Supreme Court of Oklahoma.

Dec. 16, 1997.

M. Scott Ash, The Ash Law Firm, Tulsa, for Plaintiff–Appellant.

Truman B. Rucker, Law Office of Truman B. Rucker, Tulsa, for Defendant–Appellee Tulsa Metropolitan Ministry.

Harry M. Crowe, Law Office of Harry M. Crowe, Tulsa, for Defendant–Appellee Olsen Coffey Architects.

OPALA, Justice.

¶1 We are asked to decide today whether the evidentiary material tendered by TMM and Architect to support the trial court's summary judgment in their favor provides undisputed proof of the open and obvious character of the premises' condition, which will support but a single inference that favors nonliability. We answer in the affirmative.

¶2 Eric Pickens (Pickens) sued Tulsa Metropolitan Ministry (TMM), an Oklahoma Corporation, the owner of The Tulsa Day Center for the Homeless (the Day Center), a day center and nighttime shelter for the homeless in Tulsa, alleging that TMM was negligent in constructing and maintaining on its premises a retaining wall without guardrails or barriers. Pickens also sued Olsen Coffey Architects (Architect), alleging that Architect negligently designed the retaining wall. Pickens himself has no memory of how he came to be injured. He was found on the sidewalk at the foot of the retaining wall. A witness gave a deposition that Pickens was asleep on the retaining wall and fell off as he rolled over in his sleep. Pickens had been

drinking and at a minimum had consumed six cans of beer. TMM and Architect sought and secured summary judgment. The trial court found that "the condition or defect complained of was open and obvious." Pickens appealed claiming that: 1) whether the defect was open and obvious is a question of fact for a jury, 2) whether the condition was open and obvious must be viewed in light of Pickens' inebriated condition, and 3) the open and obvious defense is not available to an architect in a suit for damages for defective design. We hold that (a) the condition of the retaining wall was open and obvious as a matter of law, (b) Pickens' inebriated condition does not bear on the determination of what is an open and obvious defect or condition, and (c) an architect is not liable for a patent design defect or condition.

## I

### THE ANATOMY OF LITIGATION

¶ 3   The Tulsa Day Center for the Homeless opened its doors on January 9, 1995. Previously, it had operated the same type of facility at a location approximately one block away. During the daytime, the Day Center offered food, clothing, shelter, showers, and various social services to the homeless of Tulsa. At night, the Day Center provided sixty-five spaces for homeless people to sleep indoors. The sixty-five indoor spaces were allotted on a priority system, women and children receiving the highest priority and young, healthy males receiving the lowest. Throughout the year, but especially during clement weather, more than sixty-five people came to the Day Center to sleep. Those who did not receive spaces inside often slept outside of the Day Center. The Day Center insists that people were only permitted to sleep in the area by the front door where the Day Center's employees could see them. Signs prohibiting sleeping were placed at various spots on the building, but whether those signs were posted before or after Pickens' accident is not clear. Despite this prohibition on sleeping anywhere other than by the front door, many homeless people sat, socialized, drank, and slept at other locations on the property. The Tulsa police expressed concern to representatives of TMM about the

nightly activity occurring on its property *after* the Day Center locked its doors. Security patrols by the Day Center ended outside by 10:30 p.m., and any efforts to remove people from prohibited locations ended at that time unless an altercation caused the employees to summon the police to remove someone. Drinking was also prohibited, but no evidentiary material was tendered which embodied this prohibition in written form and no employee could say that the Day Center had a policy to inform people of this rule upon their arrival at the Day Center.

¶ 4   Along the southern edge of the Day Center's property is a retaining wall. A grassy area abuts the retaining wall and a parking lot separates the grassy area from the Day Center building. The homeless who congregated on the property liked to socialize in this area because it was largely hidden from the view of the Day Center employees on the building side and from the police on the street side. The retaining wall was variously described as rising seven feet, eight feet, or nine feet from a sidewalk, which abutted the retaining wall from below. A grassy area then separated the sidewalk from the street. Before Pickens' accident, two other individuals had fallen off the retaining wall, suffering serious, but not life threatening injuries. Both of them were intoxicated at the time of their injury. Their falls were noted in the Day Center's log book. A homeless woman who used the Day Center at that time told the Day Center employees that a railing should be put along the wall to prevent people from getting out there. TMM did not post on its property any warning in writing specifically referring to any danger associated with the wall and did not warn Pickens verbally of any such danger.

¶ 5   Before, and within one week of, the evening of August 3, 1995, Pickens had slept outside the Day Center, by the front door, on at least a couple of occasions. He had been permitted inside the locked Day Center building to use the restroom after hours. He was not told of any rules prohibiting drinking, being intoxicated, or sleeping anywhere on the Day Center's property, and had not seen any posted signs setting forth the prohi-

bition against sleeping around the perimeter of the building.

¶ 6 On the evening of August 3, 1995, Pickens returned to the Day Center from his day job as a laborer. He intended to sleep outdoors in order not to miss the bus that would return him to his job the next morning. He did not eat dinner at the Day Center that evening nor did he receive any other services from the Day Center that day. He was reportedly seen by one witness on the property around 5:30 p.m. or 6:00 p.m. Pickens has no recollection of anything he did between the time he came back to the Day Center property and the time of his accident. He does not remember going to the retaining wall or falling off the retaining wall. Nelson Nails, a homeless person, is the only known witness to the accident. He came up to the Day Center property to drink, socialize, and sleep in the grassy area by the retaining wall. Two other persons were there drinking. Nails was approximately ten feet away from Pickens. He described Pickens as lying on the retaining wall asleep. Nails says that when he saw Pickens lying on the wall, he said to his companions that Pickens was going "to mess around and fall off the wall." At that moment, according to Nails, Pickens turned over in his sleep and rolled off the wall onto the sidewalk below. Pickens suffered massive head and spinal cord injuries and is paralyzed. Claiming that TMM was negligent in constructing and maintaining the retaining wall without guardrails or barriers and that Architect was negligent in designing the retaining wall, Pickens sued both.

¶ 7 TMM urged that based on Pickens' entry status on the property, it had no duty to warn him of, or protect him from, a condition which was open and obvious and of which he had personal knowledge. Architect urged that it had no duty of care toward Pickens, but, if it did have such a duty, it had not breached that duty because the condition of the wall was open, obvious and personally known to Pickens. The trial court agreed and summary judgment was granted for both defendants. On this appeal, Pickens claims that (a) his entry classification imposes a duty of care on TMM to make the premises safe for him, (b) the open and obvious character of the premises must be viewed in light of his intoxicated condition and, when viewed in this way, it was not open and obvious, and (c) Architect breached its duty to him when it designed the retaining wall and failed to take into account the fact that intoxicated and impaired homeless people regularly drank, socialized, and slept outside the Day Center and would foreseeably come to be on or near the retaining wall without perceiving its dangerous condition. Because the trial court's disposition was effected by summary judgment, the issues on review stand before us for *de novo* examination.[1] In reviewing any summary adjudication order, the court may consider, in addition to the pleadings, such items as depositions, affidavits, admissions, answers to interrogatories, and other evidentiary materials submitted to the trial court by the parties and view all facts and inferences in the light most favorable to the non-movant. Only where the court concludes that there is no substantial controversy as to any material facts which would justify a trial is the movant entitled to summary judgment as a matter of law.[2]

## II

### PLAINTIFF'S ENTRY STATUS DETERMINES THE DUTY OF CARE OWED TO HIM

¶ 8 In any case based upon negligence, the threshold question is whether the defendant had a duty to the particular plaintiff alleged to have suffered injury.[3] In this

1. *Brown v. Nicholson, Pate, and Spears*, 1997 OK 32, ¶ 5, 935 P.2d 319, 321. Issues of law are reviewable by a de novo standard. An appellate court claims for itself plenary, independent and non-deferential authority to re-examine a trial court's legal rulings. *Kluver v. Weatherford Hospital Authority*, 1993 OK 85, ¶ 14, 859 P.2d 1081, 1083; *see also Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

2. *Hargrave v. Canadian Valley Electric Coop.*, 1990 OK 43, ¶ 14, 792 P.2d 50, 55.

3. *Grover v. Superior Welding, Inc.*, 1995 OK 14, ¶ 5, 893 P.2d 500, 502; *Rose v. Sapulpa Rural Water Co.*, 1981 OK 85, ¶ 17, 631 P.2d 752, 756.

case, Pickens was injured while on real property owned and operated by TMM. TMM argues that its duty to Pickens is restricted by the entry classification system employed in premises liability cases. Pickens urges this court to reject the use of an injured party's entry status in determining the duty of care owed to an injured party by a property owner. Pickens cites cases from California (and some other states) which have abolished the common law approach to premises liability.[4] In those states, a landowner is liable for failure to use due care to maintain a reasonably safe premises, no matter what the entrant's status. This court has steadfastly adhered to the common law regime in premises liability cases.[5] Its commitment was most recently restated and the status-based classification regime applied in *Brown v. Nicholson.*[6] We decline the invitation to depart from precedent followed since statehood.

## III

## TMM DID NOT BREACH A DUTY OF CARE TO PICKENS

¶ 9 Entrants onto real property fall into three categories: trespasser, licensee, and

invitee. The parties in this case do not agree on Pickens' entry status. TMM contends that Pickens is either a trespasser or, at best, a licensee. Pickens contends that he is an invitee or, at worst, a licensee.

¶ 10 The terms trespasser, licensee, and invitee denote a graduated ranking representing the degree of beneficial interest a property owner has in another person's presence on his property. The determination of entry status is critical in a premises liability case because the duty of care the property owner must exercise expands or contracts based on the entrant's status.[7] To a trespasser, a landowner owes in the common law status-based classification system only a duty to avoid injuring him wilfully or wantonly.[8] To a licensee,[9] an owner owes a duty to exercise reasonable care to disclose to him the existence of dangerous defects known to the owner, but unlikely to be discovered by the licensee.[10] This duty extends to conditions and instrumentalities which are in the nature of hidden dangers, traps, snares, and the like.[11] To an invitee,[12] an owner owes the additional duty of exercising

4. *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal. Rptr. 97, 443 P.2d 561, 563–564 (1968); *Kenney v. Grice,* 171 Colo. 185, 465 P.2d 401, 403 (1970); *Mile High Fence Company v. Radovich,* 175 Colo. 537, 489 P.2d 308, 313 (1971).

5. In *Sutherland v. Saint Francis Hospital, Inc.,* 1979 OK 18, ¶ 5, 595 P.2d 780, 781, this court stated:

"Land possessor's liability in negligence for harm occurring upon the premises varies with the status of the entrant complaining of injury.... This has been the common law approach ever since landlord's sovereignty and immunity for acts done within the boundaries of His land gradually gave away to present-day civil accountability. When modern tort law finally incorporated possessor's liability, the concept of negligence came to be applied within the restrictive framework of relational, status-based duties. In short, the common law has never seen fit to extend its principles of general negligence (as they came to be fashioned in the last century) to govern harm occasioned on the premises of others.... Although questioned in some literature and even repudiated by isolated case-law pronouncements in at least two states, the common-law approach has continued to command our unswerving commitment."

*Byford v. Town of Asher,* 1994 OK 46 ¶ 5, 874 P.2d 45, 51 (Opala, J., concurring) (referring to the general negligence approach in premises liability cases as the "California madness".)

6. *Supra,* note 1.

7. *Byford, supra,* note 5 at ¶ 4, at 51 (Opala, J., concurring).

8. *Woodis v. Oklahoma Gas & Electric Co.,* 1985 OK 62, n. 10, 704 P.2d 483, 490 n. 10 (Opala, J., dissenting); *Byford, supra,* note 5 at n. 4 (Opala, J., concurring).

9. One who enters onto property of another for his own benefit or pleasure by express or implied permission of the landowner. *Brown, supra,* note 1 at ¶ 6, at 321.

10. *Brown, supra,* note 1 at ¶ 6, at 321; *Henryetta Construction Co., v. Harris,* 1965 OK 88, 408 P.2d 522, 531–532 (1965).

11. *Brown, supra,* note 1 at ¶ 11, at 322.

12. One who uses the premises of another for the purpose of a common interest and mutual advantage. *Brown, supra,* note 1 at ¶ 7, at 321.

reasonable care to keep the premises in a reasonably safe condition for the reception of the visitor.[13] Even *vis-a-vis* an invitee, to whom a landowner owes the highest duty in this trichotomous classification system, the law does not require that the landowner protect the invitee against dangers which are so apparent and readily observable that one would reasonably expect them to be discovered.[14] In other words, a landowner owes to an invitee, as well as to a licensee, a duty to protect him from conditions which are in the nature of hidden dangers, traps, snares and the like. A hidden danger within this rule of liability need not be totally or partially obscured from vision or withdrawn from sight; the phrase is used to describe a condition presenting a deceptively innocent appearance of safety 'which cloaks a reality of danger'.[15] Furthermore, failure to remove known but obvious hazards by alteration or reconstruction of the premises is not a breach of the landowner's duty even to an invitee.[16] Whether harm from an open and obvious defect is actionable depends on an objective standard of due care—i.e., whether under similar or like circumstances an ordinary prudent person would have been able to see the defect in time to avoid being injured.[17]

¶ 11 Having reviewed the applicable law, we find it unnecessary to resolve the question of Pickens' precise entry status. Even if, as Pickens argues, he was an invitee, we hold that TMM breached no duty to him. The evidentiary materials tendered in this case fail to show that the retaining wall from which Pickens fell posed a hidden danger, trap, snare, or the like. It did not have a "deceptively innocent (or harmless) appearance," cloaking a reality of danger. Photographs show that it was not totally or even partially obscured from vision.[18] All witnesses stated that they were aware of its existence and location on the property. Witnesses reported the lighting in the area to be sufficient to see the retaining wall.[19] Nothing in the record indicates how Pickens approached the retaining wall that unfortunate night; he has no recollection of his accident. Therefore there is nothing in the record from which it reasonably can be concluded that the retaining wall was withdrawn from Pickens' sight that night, or that he approached it in a way in which its existence was obscured, or that there was anything about the wall at that time that was different from what Pickens had observed about the wall at other times. Pickens had been on the property of the Day Center before the night of his accident and he had seen the retaining wall. He knew of its existence, he knew of its location on the property, he knew of its height, he knew it had no barriers or guardrails to prevent falls, and he knew that an unguarded wall was a dangerous thing. Nothing about this wall was hidden or obscured, undiscoverable or in fact undiscovered. The wall was not defective. It did not collapse causing a fall or collapse and fall upon anyone. The wall on the night in question was exactly as the wall was at all other times when Pickens had seen it and understood its nature.[20]

13. *Henryetta Construction Co., supra,* note 10 at 532; *Rogers v. Hennessee,* 1979 OK 138, ¶ 3, 602 P.2d 1033, 1034.

14. *Henryetta Construction Co., supra,* note 10 at 531; *Sutherland, supra,* note 5 at ¶ 18, at 783 (duty to use ordinary care to maintain premises in a reasonably safe condition "does not require that an invitee be warned of or otherwise protected from perils that are open and obvious.").

15. *Henryetta Construction Co., supra,* note 10 at 531.

16. *Rogers, supra,* note 13 at ¶ 3, at 1034; *Buck v. Del City Apartments, Inc.,* 1967 OK 81, 431 P.2d 360, 365 (1967).

17. *Byford, supra,* note 5 at ¶ 6, at 52 (Opala, J., concurring); *Henryetta Construction Co., supra,* note 10 at 531; *Jack Healey Linen Service Co. v. Travis,* 1967 OK 213, 434 P.2d 924, 927 (1967).

18. See discussion *infra.*

19. See discussion *infra.*

20. Pickens' knowledge of the existence and attributes of the wall is shown in the following excerpt from his deposition:

Q. Well, when's the first time you knew that wall was there?
A. I knew it was there.
Q. The first time you ever went to their property?
A. Yes.
Q. And that would have been a couple of days before their—your accident?
A. Yes.

¶ 12 Pickens denies that the photographs of the wall accurately depict the property as it would have appeared on the night of his accident because the photographs were taken in daylight and his accident occurred at night. Although Pickens did not fall off the wall until sometime around 1:00 a.m., he was unable to provide any evidence as to what time he approached the wall. In early August, sufficient natural light exists until quite late. There being no way to know when he approached the wall, it cannot be said that natural light was not still available to illuminate the area. Even if he approached the wall after dark, the only evidentiary material relating to the issue of light in the vicinity of the retaining wall indicates that the area is illuminated by sufficient artificial light to reveal the presence of the wall.[21]

Q. Okay. When you first saw it were you aware it was—I think you said eight or nine feet high?
A. Yeah.
Q. You were aware where the location of it was—
A. Yeah.
Q. —at that time?
A. Yes.
Q. Was there anything about that wall that—that you've later come to find out that was hidden?
A. I don't understand what you mean.

. . . .

Q. Okay. Now, on the night of this accident did you know that the wall was—the retaining wall was present on the Day Center facility?
A. What you mean on the night of the accident?
Q. Well, on the evening—let's start off with the evening before your accident. When you—when you got back to the Day Center from work—is that where you went to after you got off work, at the Day Center?
A. Yes.
Q. When you got back there did you know that retaining wall was there?
A. Yes.
Q. Did you know it was eight to nine feet high?
A. Yes.
Q. Was there anything about it that you didn't know at the time that you do now?
A. I don't understand the question.
Q. Okay. Well, was there anything hidden about that wall that you've later found out about, any—anything that's—was dangerous about that wall that you—you didn't know about at the time that you got to the Day Center following your work on August 3rd?
A. I don't understand the question.
Q. All right. I—I—I appreciate you telling me. When you got to the Day Center on August 3rd after work was there anything about that wall that was changed from the—the previous couple days that you'd seen that wall?
A. No.
Q. It was exactly the same, wasn't it?
A. Yes.
Q. It's pretty easy to see that wall, isn't it?
A. Yes.

Q. It's pretty easy to see that it's roughly eight or nine feet tall?
A. Yes.
Q. Is that wall dangerous in any way?
A. Yes, yes.
Q. In what way?
A. How do you mean?
Q. Well, I'm just asking you. I asked you if the wall was dangerous in any way and you said, "Yes," and I'm trying to find out how you think it's dangerous.
A. Because it's a wall, you know. I don't—I don't understand the term how it's dangerous. I don't—.

21. The following answers by Pickens in his deposition reveal that inadequate lighting was not a factor:

Q. Can you recall whether you were able to observe people on all parts of the Day Center property . . .
A. Yes.
Q. . . . after dark?
A. Yes.
Q. Was there enough lighting to be able to do that?
A. Yes.
Q. Even at the outer edges?
A. Yes.
Q. If somebody were sitting or laying on the retaining wall we've been talking about after dark, would there be enough light for someone to—to see them?
A. Uh-huh.
Q. Would—
A. Yes.
Q. Would there be enough light for them to see the retaining wall?
A. Yes.
Q. In your opinion were there any problems with the lighting on the—on the facilities—
A. No.
Q. Are you—are you aware of whether any problem with the lighting had anything to do with your accident?
A. I don't know.
Q. Has anybody told you it has?
A. No.
Q. Can you—knowing what the lighting condition was as you've described it to me, can you in any way envision that the lighting would have been a problem for you?
A. No.

¶ 13   As we view the evidentiary materials, (a) they provide undisputed proof of the open and obvious character of the premises condition involved in Pickens' injuries, and (b) all inferences from the probative materials are consistent with defendants' nonliability. Although Pickens' knowledge of the condition of the property is not fatal to his recovery, whether his foreknowledge should have prevented the harm is to be measured by the objective standard of a reasonable person.[22]  In this case, a reasonable person with Pickens' knowledge of the condition of the premises should have been able to avoid the harm.

¶ 14   Pickens cites our most recent pronouncement on the open and obvious doctrine, *Brown v. Nicholson,*[23] in support of his contention that the retaining wall in this case was not open and obvious. His reliance on this case is inapposite. In *Brown,* the condition of the premises, whether Brown's fall was caused by a hidden snare or defect, presented a disputed question of fact making summary adjudication inappropriate.  No hidden snare or defect is presented by the record in the instant case.

¶ 15   Pickens argues that TMM is not an ordinary landowner, but a landowner who operates a facility which provides services to people with impaired mental faculties, including people who are severely intoxicated.  As such, Pickens argues, TMM owed him an elevated duty of care, proportional to his incapacity for self-protection due to intoxication.  We do not agree.  This court held in *Brigance v. Velvet Dove Restaurant, Inc.,*[24]

that a tavern owner has a duty to use reasonable care in selling alcohol to intoxicated persons who might subsequently injure a third party.  In *Ohio Casualty Insurance Co. v. Todd,*[25] we refused to extend that duty to an adult customer who voluntarily becomes intoxicated and is injured.  Recognizing that the concepts of duty and liability are questions of public policy and can change with the evolving attitudes and needs of society,[26] the court listed several reasons why public policy would be ill served by extending the liability of a tavern owner to a voluntarily intoxicated adult.[27]  For like reasons, we refuse in this case to alter the landowner's duty with respect to open and obvious premises' conditions or defects which an ordinary prudent person would recognize and of which this plaintiff had actual, personal knowledge.[28]

¶ 16   Plaintiff also urges this court to recognize a special relational duty of care by a homeless shelter to persons coming onto its property, whether actually partaking of its services or not.  Instances where a heightened duty of care is imposed on a landowner for the safety of persons coming onto the landowner's property generally involve custodial situations where someone is charged specifically with the duty of caring for another person's safety.  Plaintiff cites a number of cases in which such a specialized duty of care is imposed on a hospital for the safety of its patients.[29]  A specialized duty has also been found with respect to a prisoner in a jail.[30]  In *Sutherland v. Saint Francis*

**22.**  *Byford, supra,* note 5 at ¶ 15, at 54 (Opala, J., concurring).

**23.**  *Supra,* note 1.

**24.**  1986 OK 41, 725 P.2d 300 (rehearing denied).

**25.**  1991 OK 54, 813 P.2d 508.

**26.**  *Id.* at ¶ 13, at 511; *Brigance, supra,* note 24 at ¶ 11, at 303.

**27.**  "Lifting the causal barrier for claims by tipsy drinkers against their liquor suppliers is not likely to foster safer consumer habits nor exhort the public to moderation.  Legal liability that can be shared with or shifted to another tends to diminish an individual's sense of personal responsibili-

ty for the consequences of his (or her) own conduct.  That in turn poses danger to the public."  *Todd, supra,* note 25 at ¶ 14, at 518 (Opala, C.J., concurring).

**28.**  *Esther v. Wiemer,* 1993 OK CIV APP 145, 859 P.2d 1140 (property owner owed common law duty of care to intoxicated person who fell down wet steps to his death).

**29.**  *See, e.g., Pierce v. Mercy Health Center, Inc.,* 1992 OK CIV APP 110, 847 P.2d 822; *Sutherland, supra,* note 5 at ¶ 20, at 783–784 ("To them [patients] the degree of care the hospital owes is much higher.  It is commensurate and consistent with their physical or mental debility.").

**30.**  *Wilson v. City of Kotzebue,* 627 P.2d 623 (Alaska 1981).

*Hospital, Inc.*, we recognized that a hospital owes a higher duty of care to its patients than an ordinary possessor owes to entrants, but in a suit by the husband of a patient who was injured falling off a chair while sitting at his wife's bedside, we refused to elevate the hospital's duty to an invitee above the existing level and make that duty the same as that which applies to patients.[31] None of the cases cited by plaintiff convinces us to extend a specialized duty of care to a homeless shelter, which provides food, clothing, and temporary shelter to individuals who are free to accept those services or not, to stay or to go, and who, for better or worse, are considered legally competent adults. Pickens was not in the care and custody of the homeless shelter. At most, he was an invitee or licensee on its property, and we see no reason in the cases cited to abandon, under these circumstances, the common law classification system and its legal ramifications.

## IV

## AN ARCHITECT MAY BE HELD LIABLE TO THIRD PARTIES IN NEGLIGENCE, BUT ARCHITECT IN THIS CASE BREACHED NO DUTY OF CARE TO PICKENS

¶ 17   Plaintiff urges this court to hold that an architect can be held liable to a third party[32] in negligence for injuries arising from a defect or condition designed by the architect. Just as premises liability rules historically limited the duty owed by a landowner to an entrant, so too did the "accepted

work doctrine" historically limit the liability of architects, engineers, contractors, and other members of the construction industry for injuries arising from design or construction defects.[33] In its original form, the accepted work doctrine relieved an independent contractor of liability for injuries to third parties after the contractor had completed the work, and the owner or employer had accepted the work, regardless of the contractor's negligence in completing the project.[34] The source of this rule, as well as its counterpart in pre-MacPherson products liability cases, is the nineteenth century English case of *Winterbottom v. Wright*,[35] in which it was said that one not a party to a contract was barred from suing on a claim of breach of duty arising out of the contract. In addition to lack of privity, later courts found other reasons for refusing to impose liability on manufacturers and contractors, including the prevention of excessive litigation and the theory that acceptance of the work by the owner operates as an intervening cause as a matter of law.[36]

¶ 18   In the area of negligence, the privity of contract requirement was abolished early in the twentieth century in the landmark case of *MacPherson v. Buick Motor Co.*, in which it was held that a manufacturer has a duty to those who may foreseeably be expected to use his products or to be in the vicinity of such usage to exercise reasonable care in the design and manufacture of those products.[37] The *MacPherson* reasoning was not immediately applied to negligence claims against builders and architects,[38] giving rise to a great deal of critical analysis and recom-

---

31.   *Sutherland, supra*, note 5 at ¶ 20, at 783–784.

32.   *I.e.*, one other than the person with whom the architect is in privity of contract with respect to the design of the condition which allegedly caused injury.

33.   *Horton v. Goldminer's Daughter,* 785 P.2d 1087, 1089 (Utah 1989).

34.   *Lynch v. Norton Construction, Inc.,* 861 P.2d 1095, 1097 (Wyo.1993); *Pennington v. Cecil N. Brown Co., Inc.,* 187 Ga.App. 621, 371 S.E.2d 106, 107 (1988); *McKinstry v. County of Cass,* 228 Neb. 733, 424 N.W.2d 322, 328–29 (1988).

35.   10 M & W 109, 11 L.J.Ex. 415, 152 Eng.Rep. 402 (1842).

36.   *Slavin v. Kay,* 108 So.2d 462 (Fla.1959); *see also, Hanna v. Fletcher,* 97 U.S.App.D.C. 310, 231 F.2d 469, 58 A.L.R.2d 847 (1956), *cert.den. sub.nom. Gichner Iron Works, Inc. v. Hanna,* 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956) (analyzing and rejecting the various rationales for the accepted work doctrine).

37.   217 N.Y. 382, 111 N.E. 1050 (Ct.App.1916).

38.   Relying upon *MacPherson,* the United States District Court of Appeals for the District of Columbia in 1956 rejected the privity requirement in a case against a building contractor in the case of *Hanna v. Fletcher, supra,* note 36. This was followed by the application of the *MacPherson* rule to architects in *Inman v. Binghamton Housing Authority,* 3 N.Y.2d 137, 143 N.E.2d 895, 164 N.Y.S.2d 699 (1957) (architect was not liable because the defect was not latent.).

mendations for change.[39] In response to such criticism and to avoid an unjust result, courts developed several now firmly established exceptions to the accepted work doctrine. Under this "modified" accepted work rule, liability is imposed after the work has been accepted where a defect is latent or hidden, in cases of fraud or deceit, where the contractor deliberately conceals a defect, where a nuisance has been created, or where the product of the contractor's work is inherently or imminently dangerous.[40] The majority of jurisdictions today reject even this modified accepted work doctrine, claiming that it is an unwieldy rule in which its essence has become enveloped by its complex exceptions.[41] In its place, the *MacPherson* doctrine is now generally applied in contractor liability cases.[42]

¶ 19 In Oklahoma, the *MacPherson* approach was adopted in products liability cases in *Crane Co. et al. v. Sears,*[43] and in *Leigh v. Wadsworth,*[44] where this court held that the absence of privity of contract will not bar an injured third party from recovering damages for injuries received as a result of a contractor's negligent work. The rejection of the lack-of-privity rationale in *Leigh* did not result in the complete abrogation of the accepted work doctrine in Oklahoma. We recognized this doctrine in the early case of *Armstrong v. City of Tulsa,*[45] in which we held that an independent contractor who has turned over his work and had it accepted by the owner is not subject to liability to third parties injured by the defective condition of the work. Liability, if any, is placed on the owner who has maintained or used the property in its defective condition, and the contractor's liability, if any, is solely to the owner for breach of contract.[46] In later cases, this court recognized the various exceptions

---

**39.** As early as 1934, in the *Restatement of the Law of Torts,* vol II, § 385 at 1030, it was said that one who is involved in building or creating a condition of real property is:

"... subject to liability to others within or without the land for bodily harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor under the same rules as those ... determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others."

**40.** *Lynch, supra,* note 34 at 1097; *Slavin v. Kay, supra* note 36; C.T. Drechsler, Annotation, *Negligence of Building or Construction Contractor as Ground of Liability upon his Part for Injury or Damage to Third Persons Occurring After Completion and Acceptance of the Work,* 58 A.L.R.2d 865, 870 (1958).

**41.** *Strakos v. Gehring,* 360 S.W.2d 787, 791 (Tex. 1962) ("We believe that outright rejection of this oft-repudiated and emasculated doctrine would restore both logic and simplicity to the law.")

**42.** William L. Prosser, *Handbook of the Law of Torts,* § 99 at 695 (3rd Ed.1964):

"By now, however, there has been a general overthrow of the ancient approach, and it is in full retreat. The analogy of *MacPherson v. Buick Motor Co.* has been persuasive, and finally has been accepted. A series of decisions have applied it to building contractors, placing them upon the same footing as sellers of goods, and holding them to the general standard of reasonable care for the protection of anyone who might foreseeably be endangered by their negligence, even after acceptance of the work. This is now the majority rule, not only as to contractors doing original construction work, but also as to those doing repair work or installing parts, as well as supervising engineers and architects."

*See also,* W. Page Keeton, *Prosser and Keeton On Torts,* § 104A at 723 (5th Ed., Lawyers's Ed.1984); Cases in other jurisdictions adopting the *MacPherson* approach are: *Inman v. Binghamton Housing Authority, supra,* note 38; *Dow v. Holly Manufacturing Co.,* 49 Cal.2d 720, 321 P.2d 736 (1958); *Strakos v. Gehring, supra,* note 41; *Totten v. Gruzen,* 52 N.J. 202, 245 A.2d 1 (1968); *Lynch, supra,* note 34; *Russell v. Arthur Whitcomb, Inc.,* 100 N.H. 171, 121 A.2d 781 (1956); *Tipton v. Clower,* 67 N.M. 388, 356 P.2d 46 (1960); *Talley v. Skelly Oil Co.,* 199 Kan. 767, 433 P.2d 425 (1967); *Foley v. Pittsburgh–Des Moines Co.,* 363 Pa. 1, 34–37, 68 A.2d 517 (1949) ("... there is no reason to believe that the law governing liability ... should be, or is, in any way different where real structures are involved instead of chattels. There is no logical basis for such a distinction, ... The principle inherent in the *MacPherson v. Buick Motor Co.* case and those that have followed it ... cannot be made to depend upon the merely technical distinction between a chattel and a structure built upon the land.").

**43.** 168 Okl. 603, 35 P.2d 916 (1934).

**44.** 361 P.2d 849 (1961).

**45.** 102 Okl. 49, 226 P. 560 (1924).

**46.** *Id.,* 226 P. at 563; *Schlender v. Andy Jansen Company,* 380 P.2d 523, 17 A.L.R.3d 412 (1962); *Howard v. Reinhart & Donovan Co.,* 196 Okl. 506, 166 P.2d 101 (1946).

to this general rule.[47] As recently as 1980 we were presented with arguments regarding the continued vitality of the accepted work doctrine in Oklahoma, but made no pronouncement because the case turned on another issue.[48] In 1985, in *Creamer v. Bucy*,[49] the Court of Appeals (now Court of Civil Appeals) recognized the continued operation of the accepted work doctrine and applied one of its exceptions to the facts of that case.

¶20 It is unnecessary for us to decide today whether the accepted work doctrine has outlived its usefulness. Applying that doctrine to the facts of this case or applying the principles applicable to products liability cases, we must arrive at the same result. In either case, a contractor is not liable where the condition or defect alleged is patent, open, and discoverable on reasonable inspection.[50] Pickens alleges that the retaining wall from which he fell was negligently designed, the defect being either the very existence of the wall or that the wall was constructed without barriers to prevent access to the wall. No evidentiary material was proffered which directly or by way of inference provides proof that either of these possible defects, if indeed they are defects, was unknown or unknowable. This is not a case where the wall appeared sturdy but collapsed, nor is this a case where the wall failed to function for the purpose for which it was designed. Whatever the design defects, if any, they were patently obvious. Both TMM and Pickens were aware of the retaining wall and its unguarded condition. The Architect had even pointed the condition out to TMM and recommended guardrails, which TMM declined to install. All the depositions of record in this case show that the existence and attributes of the retaining wall were patently obvious to all those who viewed it.[51] Pickens acknowledged he knew all there was to know about this particular retaining wall: its existence, its height, its location on the property, and the absence from it of guardrails or protective barriers. A retaining wall, and the dangers attendant to it, are matters of common experience. There was nothing hidden in the nature of this wall. There was no danger connected with it that a casual

---

**47.** *Greenwood v. Lyles & Buckner, Inc.*, 329 P.2d 1063 (1958) (exception to the general rule where a contractor wilfully creates a condition which he knows to be immediately and certainly dangerous to third persons, who will necessarily be exposed to the danger); *Leigh v. Wadsworth, supra*, note 44.

**48.** *Minor v. Zidell Trust*, 1980 OK 144, ¶5, 618 P.2d 392, 393 ("We need not hence concern ourselves with the correctness of the architects' contention that their liability to the Motorist is legally expressible in terms coextensive with that of a builder or contractor whose 'job' has been 'accepted' by the owner.").

**49.** 1985 OK CIV APP 19, 700 P.2d 668.

**50.** *Inman v. Binghamton Housing Authority, supra*, note 38, 164 N.Y.S.2d at 703–04, 143 N.E.2d at 899.

**51.** The record contains the affidavit of Mike Neely, the Director of a Los Angeles homeless program, in which, after having walked over the Day Center property, he says of its exterior,

"The layout is one which provides many spatial illusions. The elevation changes on the site are not prominent because the building height appears to remain unchanged at all angles. The parking lot and exterior grass areas are flat and all seem to be at the same elevation.... I went to the areas near the electrical box and walked to the edge of the grassy areas and was startled when I looked down and saw nothing indicting the retaining wall was there. I then walked down a slight incline and walked around to the sidewalk, it was then that I realized the true height of the retaining wall. I noticed several trees near the sidewalk and noted that when these trees are in full bloom the tree leaves could be misleading about the relationship of the tree to the retaining wall."

Mr. Neely's observations, standing alone, suggest the possibility that the retaining wall may have presented a latent defect or condition, one which exhibited a "deceptively innocent appearance." His observations would have probative value only if they were demonstrably connected to the actual circumstances under which Pickens' injury occurred. Establishing this connection in light of the plaintiff's inability to recall any of the circumstances of his accident may be a difficult task for him, but it is one which he cannot sidestep. Plaintiff fails to tie the conditions observed by Mr. Neely, which bear on the perception of spatial relationships which persons on the property may experience, to the conditions in existence at the *locus in quo* at the date and time of plaintiff's accident. It is for this reason that Mr. Neely's affidavit cannot alter our conclusion, based as it is on all the evidentiary materials, that the premises condition was not hidden, but open, obvious, and easily discernible.

looking over would not reveal. Any hazard associated with the wall was open and easily discernible.

## SUMMARY

¶ 21 The evidentiary material in the record presents no disputed questions of fact which cannot be decided as a matter of law via summary adjudication. The record establishes that, whatever Pickens' entry status, neither TMM nor Architect breached a duty of care owing to him. This is so because the retaining wall on TMM's property from which Pickens fell and the fact that no guardrails or barriers were in place around it were patent premises conditions, open and obvious, which were discoverable on reasonable inspection by an ordinary prudent person. Moreover, Pickens had actual personal knowledge of the retaining wall, of its location, and of its unguarded condition. Summary judgment was hence the defendants' due.

¶ 22 Judgment is affirmed.

¶ 23 KAUGER, C.J., SUMMERS, V.C.J., and HODGES, LAVENDER, HARGRAVE, ALMA WILSON and WATT, JJ., concur.

¶ 24 SIMMS, J., concurs in judgment.

