1998 OK 102

Mary Jane AKIN, Surviving spouse of John D. Akin, Deceased, Plaintiff–Appellant.

v.

MISSOURI PACIFIC RAILROAD CO., d/b/a Union Pacific Railroad Co., a foreign corporation, Defendant–Appellee.

No. 86,632.

Supreme Court of Oklahoma.

Oct. 13, 1998.

Rehearing Denied May 25, 1999.

W.C. "Bill" Sellers, Sr., Sapulpa, James W. Keeley, and Randall A. Gill, Tulsa, for Appellant.

Tom L. Armstrong and Carey Cobb Calvert, Tom L. Armstrong & Associates, Tulsa, for Appellee.

OPALA, J.

¶1 The dispositive issues tendered on certiorari are (1) whether the trial court erred in granting defendant's motion for summary disposition of plaintiff's inadequate signalization theory of recovery on the grounds that it was pre-empted by federal law, and if so, (2) whether plaintiff is entitled to an opportunity to present that theory in a new trial. We answer the first question in the affirmative and the second in the negative.

**I**

**ANATOMY OF LITIGATION**

¶2 In the early morning hours of July 15, 1991, John D. Akin was traveling westbound in his pickup truck along Main Street/Highway 28 in Adair, Oklahoma. In front of him, traversing Main Street/Highway 28, was a railroad grade crossing (the "Adair crossing") owned and maintained by Missouri Pacific Railroad Co. ("Missouri Pacific" or "defendant"). At the time of Mr. Akin's accident, certain passive warning signs as well as crossbucks with flashing lights were present on both sides of the Adair crossing to warn motorists and others of the approach or presence of a train. No automatic gates were present. As Mr. Akin's vehicle was nearing the Adair crossing from the east, a train, owned and operated by Missouri Pacific, heading north, was approaching the Adair crossing from the south. The warning lights were flashing as he approached and entered the crossing, but Mr. Akin did not stop or slow down. As his vehicle crossed the tracks, it was struck by defendant's train. Mr. Akin was killed instantly.

¶3 His widow, Mary Jane Akin, brought a wrongful-death action against Missouri Pacific. Plaintiff alleged that the flashing lights at the crossing had a history of malfunctioning and that, as a result, the motoring public had ceased to view the flashing lights as a serious and reliable warning of the imminent approach of a train. Also alleged was that flashing lights were an inadequate warning device for this particular crossing, and that automatic gates were required in order to operate the crossing safely.

■ ¶4 On the day of trial, Missouri Pacific filed a series of motions, including the "Motion for Partial Summary Judgment"[1]

---

1. The motion known in lawyer's parlance as one for "partial summary judgment" is misnamed. It does not result in a judgment at all. A judgment is a final determination of the rights of the parties to an action. 12 O.S.1991, § 681. It must dispose of all issues in the case. There can be no judgment when the court disposes of but a portion of a single cause of action. Despite the misnomer, the "motion for partial summary judgment," is explicitly authorized by Rule 13 of the Rules for the District Courts, 12 O.S. Supp. 1997, Ch.2, App., which provides: "e.... If the

which is the subject of this appeal. Relying on the United States Supreme Court's decision in *CSX Transportation, Inc. v. Easterwood*,[2] defendant asked for summary adjudication of plaintiff's inadequate signalization theory of liability on the grounds of federal pre-emption.[3] The trial court granted the defendant's motion, and plaintiff was precluded from submitting her inadequate signalization theory.[4] The trial proceeded on plaintiff's other theory, that of improper maintenance of the flashing lights. The trial ended in a jury verdict for the defendant. Plaintiff brought a combined motion for vacation of judgment and motion for new trial, claiming that the trial court's pre-emption ruling as to plaintiff's inadequate signalization theory was erroneous. Plaintiff's motion was denied and she appealed.

¶5 The Court of Civil Appeals, Division 4, held that the conditions set forth in *Easterwood* for the application of federal pre-emption of state tort law had not been met, and, therefore, the trial court had erred in granting summary relief on plaintiff's inadequate signalization theory. The appellate court nevertheless affirmed the judgment in favor of Missouri Pacific, holding that the overwhelming evidence of Mr. Akin's own negligence in failing to stop at the crossing rendered harmless the trial court's error in eliminating one theory by summary adjudication. Consequently, the Court of Civil Appeals held that it was not an abuse of discretion for the trial court to deny plaintiff's motion for a new trial.

¶6 We granted certiorari on plaintiff's petition and now affirm.

## II

### STANDARD OF REVIEW OF MOTION FOR SUMMARY ADJUDICATION

¶7 Summary adjudication process is a singular pretrial procedure conducted with the aid of acceptable probative substitutes. It is an inquiry into the existence of undisputed material fact issues, which may be conducted, *sans* forensic combat, in the course of the judicial decision-making process. Its purpose is to identify and isolate non-triable fact issues, not to defeat an opponent's right to trial by jury. Only that evidentiary material which entirely eliminates from trial some or all fact issues may afford legitimate support for nisi prius resort to summary process.[5]

¶8 The issues on review of a motion for summary adjudication stand before this court for *de novo* examination[6] pursuant to several well-known principles: (1) the movant for summary disposition has the burden of showing that there is no genuine issue of material fact and that it is entitled to summary relief as a matter of law;[7] (2) the court

court finds that there is no substantial controversy as to certain facts or issues, it shall make an order specifying the facts or issues which are not in controversy and direct that the action proceed for a determination of the remaining fact or issues, ..." This rule specifically contemplates that when no material dispute is found to exist as to some fact or issue in a case, a trial can be confined to matters that remain in controversy. *Reams v. Tulsa Cable Television, Inc.*, 1979 OK 171, ¶3, 604 P.2d 373, 374. The quest for "partial summary judgment" should be termed a "motion for summary relief" on tendered issues.

2. 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

3. In *Easterwood*, the United States Supreme Court held that under certain conditions federal regulation of railroad crossing warning devices pre-empts state tort law.

4. Plaintiff had also alleged that defendant was negligent in operating its train at an excessive speed. Defendant moved for summary relief on this theory as well, also on the basis of federal pre-emption. At oral argument on the motion plaintiff conceded that her excessive speed theory was pre-empted by federal law. Plaintiff has not retendered this issue on appeal.

5. *Russell v. Bd. of County Comm'rs*, 1997 OK 80, ¶7, 952 P.2d 492, 496–497; *Gray v. Holman*, 1995 OK 118, ¶11, 909 P.2d 776, 781.

6. *Pickens v. Tulsa Metropolitan Ministry*, 1997 OK 152, ¶7, 951 P.2d 1079, 1082; *Brown v. Nicholson, Pate, and Spears*, 1997 OK 32, ¶5, 935 P.2d 319, 321. Issues of law are reviewable by a *de novo* standard. An appellate court claims for itself plenary, independent and non-deferential authority to re-examine a trial court's legal rulings. *Kluver v. Weatherford Hospital Authority*, 1993 OK 85, ¶14, 859 P.2d 1081, 1083; See also, *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

7. *Hargrave v. Canadian Valley Electric Coop., Inc.*, 1990 OK 43, ¶14, 792 P.2d 50, 55.

may consider, in addition to the pleadings, such items as depositions, affidavits, admissions, answers to interrogatories, and other evidentiary materials submitted to the trial court by the parties and shall view all facts and inferences in the light most favorable to the non-moving party;[8] and (3) only where the court concludes that there is no substantial controversy as to any material facts which would justify a trial is the movant entitled to summary adjudication as a matter of law.[9]

¶ 9  To prevail as the moving party on a motion for summary adjudication, one who defends against a claim by another must either (a) establish that there is no genuine issue of fact as to at least one essential component of the plaintiff's theory of recovery or (b) prove each essential element of an affirmative defense, showing in either case that, as a matter of law, the plaintiff has no viable cause of action.[10]

## III

### PLAINTIFF'S THEORY OF LIABILITY BASED ON INADEQUATE SIGNALIZATION IS NOT PRE-EMPTED BY FEDERAL LAW

¶ 10.  Pre-emption is a well-established legal principle which gives substance to the hierarchy of power established by the Supremacy Clause of the United States Constitution, subordinating the laws of the states to those of the federal government which were enacted pursuant to its constitutionally conferred authority.[11]  Pre-emption occurs when federal law displaces a body of state law on the same subject.[12]  Whether preemption occurs is a matter of congressional intent,[13] which may be effected even by regulations of a federal agency acting within the scope of congressionally delegated authority.[14]

¶ 11  Congress's intent to preempt may be conveyed in four ways: (1) by express statutory language; (2) by a pervasive regulatory scheme from which it can be inferred that Congress intended no state-law supplementation of federal regulations; (3) when an actual conflict between state and federal law makes it impossible to comply with both; and (4) where the objectives and purposes of Congress would be thwarted by state law.[15]  Unless it is the clear and manifest purpose of Congress, whether express or implied, to substitute its law for that of the states, a presumption against pre-emption is employed out of respect for federalism and to give effect to the historic role of the states as

8.  *Pickens, supra,* note 5 at ¶ 7, at 1082.

9.  *Id.*

10.  See, *Runyon v. Reid,* 1973 OK 25, ¶ 12, 510 P.2d 943, 946.  *Accord, Wornick Co. v. Casas,* 856 S.W.2d 732, 733 (Tex.1993).

11.  U.S. CONST.  Art. VI, cl. 2 provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Rudimentary application of pre-emption can be found in very early cases decided by the United States Supreme Court.  See, e.g., *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824) (the commerce clause prohibits a state from granting an exclusive operating license for ship pilots); *McCulloch v. Maryland,* 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819) (a state may not tax a federal bank located within that state).

12.  *Lewis v. Sac and Fox Tribe,* 1994 OK 20, ¶ 16, 896 P.2d 503, 510, *cert. denied,* 516 U.S. 975, 116 S.Ct. 476, 133 L.Ed.2d 405 (1995).

13.  Id. at ¶ 16, 896 P.2d at 511.  The Supreme Court has referred to congressional intent as the "ultimate touchstone" in pre-emption analysis. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996) quoting *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) and *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963).

14.  *Sac and Fox, supra,* note 12 at ¶ 16, at 511; *Louisiana Public Service Comm'n v. Federal Communications Comm'n,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369 (1986); *Fidelity Fed. S. & L. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984).

15.  *Sac and Fox, supra,* note 12 at ¶ 16, n. 49, at 511 n. 49; *English v. General Electric Co.,* 496 U.S. 72, 78-79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).

the primary regulators of matters of health and safety.[16]

¶ 12 *Easterwood*,[17] the controlling United States Supreme Court decision in this case, involved the interpretation of a statutory provision that expressly pre-empts state law.[18] Thomas Easterwood was killed in 1988 when a train owned and operated by CSX Transportation, Inc. struck Easterwood's truck as he was driving through a railroad crossing in Cartersville, Georgia. His widow sued CSX in the District Court for the Northern District of Georgia,[19] alleging that the railroad was liable under Georgia negligence law for failing to provide adequate warning devices at the crossing and for operating the train at an excessive speed. CSX moved for summary judgment on the ground that common-law negligence claims were pre-empted by the provisions of the Federal Railroad Safety Act of 1970 ("FRSA"), 84 Stat. 971, as amended, 45 U.S.C. §§ 421–447 (1988 ed. and Supp. II).[20] The federal district court agreed with CSX and granted summary judgment in its favor as to both of plaintiff's theories.[21] Mrs. Easterwood appealed, and the Eleventh Circuit Court of Appeals, affirming in part and reversing in part, held that while the excessive speed claim was indeed pre-empted, the theory of negligence based on the inadequacy of warning devices was not.[22] The Supreme Court granted certiorari to resolve a disagreement among the federal circuit courts on the pre-emptive effect of FRSA.[23]

¶ 13 The Court began its opinion by examining the statutory language of FRSA to determine whether and to what extent Congress intended to pre-empt state law. First enacted in 1970, FRSA's purpose was "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons...."[24] To carry out this purpose, the Secretary of Transportation was directed

16. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ("Congress legislated here in a field which the States have traditionally occupied, (citations omitted). So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (citations omitted.)). *Id.*, at 218, 229, 67 S.Ct., at 1146, 1152. The presumption against pre-emption is employed whether pre-emption is express or implied. In the case of express pre-emption, of course, the presumption gives way in the first instance to the explicit congressional directive, but it is then applied to ascertain the scope of pre-emption. *Medtronic, Inc. v. Lohr, supra*, note 13 at 470, 485, 116 S.Ct., at 2250. ("Although dissenting Justices have argued that this assumption should apply only to the question whether Congress intended any pre-emption at all, as opposed to questions concerning the scope if its intended invalidation of state law, see *Cipollone*, 505 U.S., at 545–546, 112 S.Ct., at 2632–2633 (SCALIA, J., concurring in judgment in part, and dissenting in part), we used a 'presumption against the pre-emption of state police power regulations' to support a narrow interpretation of such an express command in *Cipollone*. *Id.*, at 518, 523, 112 S.Ct., at 2618, 2621.").

17. *Easterwood, supra*, note 2.

18. The *Easterwood* analysis therefore goes primarily to the question of the scope of the pre-emption, rather than whether pre-emption was intended. The clearest expression of Congressional intent to pre-empt is found when Congress includes in legislation an express provision for pre-emption, and although the presence of express pre-emptive language means that the Court need not look beyond the language to determine congressional intent to pre-empt at least some state law, the Court in such a case must nonetheless identify the scope of the expressly intended pre-emption. *Medtronic, Inc. v. Lohr, supra*, note 13 at 470, 484, 116 S.Ct., at 2250; *Cipollone, supra*, note 13 at 504, 517, 112 S.Ct., at 2618; See, Paul E. McGreal, *Some Rice with Your Chevron?: Presumption and Deference in Regulatory Preemption*, 45 CASE W. RES. L. REV. 823, 841 n. 79 (1995).

19. *Easterwood v. CSX Transp. Inc.*, 742 F.Supp. 676 (N.D.Ga.1990).

20. FRSA's initial codification in Title 45 was repealed in 1994. The recodification took place pursuant to Pub.L. No. 103–272, July 5, 1994, 108 Stat. 1379, and now appears beginning at 49 U.S.C. § 20101. The recodification did not substantively change the sections relevant to this case. We refer to the statutes by their section numbers as they existed at the time of Mr. Akin's accident.

21. *Easterwood v. CSX Transp., Inc.*, 742 F.Supp. 676, 678 (N.D.Ga.1990).

22. *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1553–1556 (11th Cir.1991), *aff'd, Easterwood, supra*, note 2.

23. 505 U.S. 1217, 112 S.Ct. 3024, 120 L.Ed.2d 896 (1992).

24. 45 U.S.C.A. § 421 (1986). The number of accidents and deaths from grade crossing accidents, which had been declining up until 1958,

to study and develop solutions to safety problems posed by grade crossings[25] and to "... prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety...."[26] The pre-emptive effect of the regulations and other prescriptions that the Secretary was authorized to adopt was expressly set forth in the terms of 45 U.S.C.1986 § 434, which state:

" § 434. National uniformity of laws, rules, regulations, orders, and standards relating to railroad safety; State regulation

The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order or standard, and when not creating an undue burden on interstate commerce."

Thus, FRSA's pre-emption provision contains within itself clauses which both pre-empt and save state action.[27] One of the savings clauses permits states to continue in force any law, rule, regulation, order or standard relating to railroad safety *until* the Secretary adopts a rule, regulation, order or standard *covering the subject matter* of the state requirement. Conversely, *once* the Secretary adopts a rule, regulation, order, or standard *covering the subject matter* of a state-law requirement, the state-law requirement *must yield.*[28] Common law legal duties, such as those founded in the law of negligence, are included among the state legal norms which can be pre-empted.[29]

¶ 14 The Supreme Court then looked at three areas of regulation promulgated by the Secretary to determine whether any of them *cover* the same subject matter as state negligence law.[30] After determining that two of the areas of regulation were not inconsistent with the continuing viability of state negligence law,[31] the Court turned to the provi-

had markedly increased between that year and 1970, the year FRSA was adopted. *See, Report of the Task Force on Railroad Safety,* H.R. REP. NO. 91–1194, App. F, *reprinted in* 1970 U.S.C .C.A.N., v.2, 4104, 4126.

**25.** 45 U.S.C.A. § 433 (1986) Under the law prior to FRSA, Federal-aid highway funds could be used to improve only those grade crossings located on the Federal-aid highway system. Little more than twenty per-cent of the total number of grade crossings in the country were located on that system. Thus, federal funds could not be used to upgrade the remaining eighty per-cent of existing railroad grade crossings, which were located on city streets or on roads and highways which were not part of the Federal-aid highway system. *See, Report of the Task Force on Railroad Safety,* H.R. REP. NO. 91–1194, App. F, *reprinted in* 1970 U.S.C.C.A.N., v.2, 4104, 4126.

**26.** 45 U.S.C.A. § 431(a) (1986). The Secretary's recommendations pursuant to this section led Congress to enact the Highway Safety Act of 1973, 87 Stat. 287, 23 U.S.C.A. §§ 130 et seq., which made the states conditionally eligible for federal funds to upgrade grade crossings. The Secretary then issued regulations identifying the conditions for state use of federal funds. *See,* Robert E. McFarland, *The Preemption of Tort and Other Common Causes of Action Against Air, Mo-*

*tor, and Rail Carriers,* 24 TRANSP. L.J. 155, n. 129 (1997).

**27.** 45 U.S.C.A. § 434 (1986)

**28.** *See, Easterwood, supra,* note 2 at 658, 664, 113 S.Ct., at 1737.

**29.** *Id.; See also, Cipollone, supra,* note 13 at 504, 522, 112 S.Ct., at 2620 ("Moreover, common-law damages actions of the sort raised by petitioner are premised on the existence of a legal duty, and it is difficult to say that such actions do not impose 'requirements or prohibitions.' ").

**30.** The Court stated that "cover" is a "restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood, supra,* note 2 at 658, 664, 113 S.Ct., at 1738.

**31.** The Court first considered the regulations found in 23 CFR pt. 924, the Highway Safety Improvement Program, which require each state receiving federal aid to establish a "highway safety improvement program," which must identify hazardous highway locations, including dangerous railroad grade crossings, and prioritize projects for their improvement. The regulations also require evaluations of the effectiveness and costs of the implementation of the improvement

sions of 23 CFR §§ 646.214(b)(3) and (4), and held that these two regulations, *when applicable,* do indeed supplant state tort law.[32]

¶ 15   Sections 646.214(b)(3) and (4) are related regulations setting forth conditions for the participation of federal funds in the installation of warning devices at railroad grade crossings.[33]   Under section (b)(3), when federal funds "participate in the installation" of warning devices at crossings where either certain track conditions exist or a diagnostic team recommends them, "adequate warning devices... are to include automatic gates with flashing light signals."   Section (b)(3)(ii) permits the Federal Highway Administration in individual cases to concur in a finding by a diagnostic team that automatic gates are not appropriate even though the specified track conditions exist.

¶ 16   Section (b)(4) comes into play when Section (b)(3) does not apply, i.e. when neither the specified track conditions exist nor a diagnostic team recommendation for automatic gates has been made.   In such a case, Section (b)(4) requires the approval of the Federal Highway Administration of the type of warning device to be installed.

¶ 17   The Court concluded that for the federally funded projects covered by these two regulations, the Secretary has removed decision making authority from the state and the railroad and replaced it with a federal requirement that particular warning devices be used or federal approval be obtained.[34]   In doing so, the Secretary has *covered* the subject matter of the adequacy of warning devices.   If the "preconditions for the application of either regulation have been met" at a particular crossing, a claim under state law

---

projects and the filing of annual reports with the Federal Highway Administration.   In rejecting these provisions as supporting pre-emption, the Court noted that they merely "establish the general terms of the bargain between the Federal and State Governments" with respect to the use by the states of federal funds in the improvement of highways.   They represent an effort "to encourage the States to rationalize their decision-making (sic)" and have "little to say about the subject matter of negligence law...." *Easterwood, supra,* note 2 at 658, 667, 113 S.Ct., at 1739.

The Court then turned to the regulations requiring that all warning devices used in grade crossing improvement projects comply with the Federal Highway Administration's Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD").   23 CFR § 646.214(b)(1) and § 655.603. CSX argued that language contained in the MUTCD, read in conjunction with 646.214(b)(1), places exclusive responsibility for grade crossing safety on the state governments. The Court instead found that "the MUTCD provides a description of, rather than a prescription for, the allocation of responsibility for grade crossing safety between the Federal and State Governments and between States and railroads." *Easterwood, supra,* note 2 at 658, 669, 113 S.Ct., at 1740.   The MUTCD is not only compatible with state law, the Court held, but contains language which explicitly denies an intent to cover the subject matter of common-law negligence. *Easterwood, supra,* note 2. at 658, 670, 113 S.Ct., at 1740.

**32.**   *Easterwood, supra,* note 2 at 658, 670, 113 S.Ct., at 1740–1741.

**33.**   23 CFR § 646.214(b)(3) provides:

"(3)(i) Adequate warning devices under § 646.214(b)(2) [railroad-highway grade crossing located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of an existing roadway] or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A)   Multiple main line railroad tracks.

(B)   Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C)   High Speed train operation combined with limited sight distance at either single or multiple track crossings.

(D)   A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E)   Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F)   A diagnostic team recommends them.

(ii)   In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable."
23   CFR § 646.214(b)(4) provides:
"For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA."

**34.**   *Easterwood, supra,* note 2 at 658, 670, 113 S.Ct., at 1741.

based on the adequacy of a warning device is pre-empted.[35]

¶ 18 Having held that pre-emption depends upon the applicability of these two regulations to the crossing in question, the Court then proceeded to look at the crossing at which Mr. Easterwood was killed to determine whether the preconditions for pre-emption had been met there. The Court found that although the Georgia Department of Transportation had decided to install an automatic gate at the crossing in question and certain preliminary work had been done, the project had never been carried out owing to the city's failure to approve construction of a necessary traffic island. The funds which had been allocated for the project were moved to another project and the decision to install a gate at the crossing in question was put on a list of projects to be considered in the future. The Court specifically noted that the only equipment which had actually been installed was motion-detection circuitry, which, the Court stated, did not meet the definition of warning devices contained in the regulations.[36] The Court's conclusion was that the "facts do not establish that federal funds 'participate[d] in the installation of the [warning] devices' "[37] and, therefore, Easterwood's tort claim was not pre-empted.

¶ 19 If *Easterwood* was ever deemed to have eliminated the uncertainties involved in the application of FRSA pre-emption, that notion was short-lived. On the contrary, *Easterwood* left unresolved many of the issues which arise in pre-emption situations.[38] One such issue is that present here, i.e., whether state tort law is pre-empted when an accident occurs before the federally designated warning devices have been installed, but after there has been federal financial participation at an earlier stage of the project and approval of the devices. *Easterwood,* because of its unusual facts and the Court's lack of specificity as to the determinative factor or factors in its decision, provides no clearly delineated guidelines for determining when the pre-emption-invoking regulations become applicable. Indeed, *Easterwood* can be read in two contradictory ways: (1) as requiring the completed installation of the federally mandated or approved warning devices before pre-emption occurs, or (2) as meaning that federal financial participation anywhere in the process of installation is sufficient to invoke pre-emption as long as installation ultimately takes place.

¶ 20 The ambiguity left by *Easterwood* has been reflected in the decisions of several of the circuits, including the United States Court of Appeals for the Tenth Circuit in which Oklahoma is situated. Between 1991 and 1995, the Tenth Circuit reviewed the issue of federal pre-emption of inadequate signalization claims three times in the same case (once *pre-Easterwood* and twice *post-Easterwood*) as *Hatfield v. Burlington Northern R.R. Co.* proceeded through the federal court system.[39] In its *second Hat-*

---

35. *Id.*

36. *Id.* at 672, 113 S.Ct. at 1741; 23 CFR §§ 646.204(i) and (j) provide:
   "(i) *Passive warning devices* means those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train.
   (j) *Active warning devices* means those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train."

37. *Easterwood, supra,* note 2 at 658, 672, 113 S.Ct., at 1741.

38. In addition to the problem discussed in the text, remaining *post-Easterwood* issues include whether pre-emption requires a specific determination by the Secretary and whether subsequent events can terminate pre-existing pre-emption. *See,* Robert E. McFarland, *The Preemption of Tort and Other Common Causes of Action Against Air, Motor, and Rail Carriers, supra,* note 26 at 180 (1997).

39. The Hatfield case began in 1991, before *Easterwood* was decided, with the case of *Hatfield v. Burlington Northern R.R. Co.,* 757 F.Supp. 1198 (D.Kan.1991). That case was appealed to the Tenth Circuit [958 F.2d 320 (10th Cir.1992)], which decision was taken on certiorari by the United States Supreme Court [507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993)], vacating the judgment and remanding the case to the Tenth Circuit for further consideration in light of *Easterwood.* The Tenth Circuit [1 F.3d 1071 (10th Cir.1993)] remanded the case to the District Court, which found that Hatfield's inadequate signalization claim was pre-empted [848 F.Supp. 158 (D.Kan.1994)]. Hatfield then ap-

*field* opinion, decided after and in light of *Easterwood,* the Tenth Circuit held that state negligence law is pre-empted on the issue of the adequacy of warning devices *at any point in an improvement project* where federal resources significantly participate in the project, including initial expenditures later reimbursable by federal-aid funds.[40] *The court thus focused on federal participation in the process of installation, rather than on participation in the result.*

¶ 21 The Tenth Circuit then remanded the case to the district court for a factual determination of whether the federal government had "significantly participated" in the project to improve the crossing at which Mr. Hatfield was injured and, if so, when that participation occurred. The district court found that the federal government had indeed significantly participated in the project and set the date of that participation and the pre-emption flowing from it as of the date the federal government committed up to $1,800 in assistance for preliminary engineering at the crossing.[41] Hatfield again appealed.[42]

¶ 22 In its *third Hatfield* opinion, the Tenth Circuit first reiterated its previously expressed view that "significant federal participation" could take the form of a non-cash investment of "resources" such as time and expertise, as well as the expenditure of funds,[43] that "significant" federal participation means " 'more than a casual financial connection' between the federal government and the project," [44] and that significant "federal participation may occur at any point in the project, including the planning stage." [45]

The court summarized its understanding of *Easterwood* as follows:

"... [T]he financial commitment must be such that it shows a clear federal intent to require a federally approved warning device at the crossing in question, backed up by the actual expenditure of federal resources of more than a casual or de minimis nature, and specifically directed toward the ultimate installation of the improved warning devices at that crossing." [46]

¶ 23 The court then applied this interpretation of *Easterwood* to the following facts: (1) federal funds were committed to preliminary engineering at the crossing in question and this engineering was completed prior to the accident resulting in Hatfield's injury; (2) federal funds were not committed to actual construction of the warning devices until after the accident; and (3) the warning devices were not fully installed and operational until long after the accident took place.[47] *The court held that the point in time at which the government committed to the preliminary engineering was the "appropriate moment" to pre-empt state tort law.*[48]

¶ 24 Mr. Hatfield had argued that in *Easterwood,* pre-emption was not triggered even though the project in that case was further along than the preliminary engineering work that had been completed in his case. That being so, he argued, mere preliminary engineering work was surely not enough to trigger pre-emption.

¶ 25 The Tenth Circuit rejected this interpretation of *Easterwood,* adopting instead the view that *Easterwood* is a case where pre-emption was denied because no expendi-

---

pealed again to the Tenth Circuit [64 F.3d 559 (10th Cir.1995)].

**40.** *Hatfield v. Burlington Northern R.R. Co.,* 1 F.3d 1071, 1072 (10th Cir.1993).

**41.** *Hatfield v. Burlington Northern R.R. Co.,* 848 F.Supp. 158, 158–159 (D.Kan.1994).

**42.** 64 F.3d 559 (10th Cir.1995).

**43.** *Id.* at 561.

**44.** *Id.*

**45.** *Id.,* referring to its opinion in *Hatfield v. Burlington Northern R.R. Co.,* 1 F.3d 1071, 1072 (10th Cir.1993).

**46.** *Id.* at 562.

**47.** *Id.* at 561.

**48.** *Hatfield v. Burlington Northern R.R. Co.,* 64 F.3d 559, 562 (10th Cir.1995) ("At that point in time—when the government committed to preliminary engineering—both the financing of the improvement project and its direction and control were removed from Burlington. The federal government had expended significant resources and control of the project had passed to state or local authorities. Therefore, this seems to be the appropriate moment to declare that railroad liability under state law for the adequacy of the traffic control devices at the crossing should be pre-empted.").

ture at all of federal resources had *ever* occurred on the crossing in question,[49] leaving it open to the court to decide where along the continuum the pre-emption-triggering event should be found. This the court did by holding that "FRSA pre-emption takes place when the federal government (1) commits itself, through a significant event or events, to a project to install active warning devices, and (2) expends significant federal resources on such a project."[50]

¶ 26 Decisions from other circuits, in cases containing facts similar to those in *Hatfield* and in the present case, have taken a decidedly different view of *Easterwood's* purport. In *St Louis Southwestern R.R. Co. v. Malone Freight Lines, Inc.*,[51] the railroad argued that federal funds participate in installation of warning devices for purposes of pre-emption as of the date a grade crossing improvement project obtains federal approval as long as the project is eventually completed and federal payment is made and received. The United States Court of Appeals for the Eighth Circuit rejected that argument, holding that pre-emption occurs only when all the warning devices designated in the federally approved improvement plan are installed and operating.[52] The court based this holding on its interpretation of *Easterwood*:

"Rather than looking to federal approval or fund allocation as triggering pre-emption, the Supreme Court focused on the equipment installed at the crossing. Because the only equipment installed was circuitry, which was not a passive or active warning device as defined in 23 CFR § 646.204(i)-(j), the Court held the claim was not pre-empted."[53]

¶ 27 Cases such as *Hatfield*, the court said, simply mistake *Easterwood's* meaning and are inconsistent with the FRSA goal of promoting railroad/highway safety. The court's reasoning is impressive and worth reciting:

"Before pre-emption, the public is protected by a railroad's state common-law duty of care. After installation of federally mandated warning devices, the public is protected by those devices. A plan to install devices and federal approval of a plan do not protect the public, however. The Railway's interpretation that federal approval triggers pre-emption would leave the public unprotected between the time of approval and the time the prescribed devices are installed and operating. This can be a substantial period of time. In this case, it was fifteen months. To encourage prompt installation of federally prescribed warning devices, a railroad's common-law duty of care must continue until those devices are installed."[54]

¶ 28 In *Thiele v. Norfolk & Western R.R. Co.*,[55] the railroad entered into an agreement with the county government and the state Department of Transportation to install automatic gates and flashing lights at a crossing which had only passive warning devices. The agreement was approved by the appropriate federal agency, and the railroad began construction. At the time of Thiele's accident, some holes had been dug and some posts had been installed for the gates, but none of the active warning devices was yet operational.[56] The court distinguished *Easterwood*, noting that *Easterwood* did not speak to the pre-emption of state tort law when the collision occurs before the federally designated warning devices have been installed, but after there has been federal financial participation and approval.[57] The court held that "when § 646.214(b)(3) or (4) applies to a crossing upgrade, there is no pre-emption of state law adequacy of warning claims *until the warning devices are installed and fully operational.* (emphasis added)"[58] Noting al-

49. *Id.*

50. *Id.*

51. 39 F.3d 864 (8th Cir.1994), *cert. denied*, 514 U.S. 1110, 115 S.Ct. 1963, 131 L.Ed.2d 854 (1995).

52. *Id.* at 867.

53. *Id.* at 866.

54. *Id.* at 867.

55. 68 F.3d 179 (7th Cir.1995).

56. *Id.* at 181.

57. *Id.* at 183.

58. *Id.*

most universal acceptance of this conclusion (*Hatfield* being the sole cited exception), the court supported its analysis first with reference to *Easterwood,* and then by an appeal to common sense and fairness:

> "Our conclusion also conforms to common sense because otherwise the public would be unprotected by either state or federal law for the period between federal approval and actual warning device installation. Before any agreement to upgrade was concluded, [the railroad] . . . was fully subject to suit under state tort law. We see nothing anomalous in continuing to impose liability on [the railroad] . . . for the warning system [the railroad] . . . had earlier cho-

sen until the new system actually superseded the old." [59]

¶ 29  In addition to *Malone* and *Thiele,* several other cases have addressed whether pre-emption occurs where federal funds participate in a project to install warning devices, but the devices themselves have not been installed prior to an accident. These cases take the view that state tort law is not pre-empted under FRSA and *Easterwood unless the warning devices have actually been installed and are operating at the time of the accident.*[60] Cases cited by defendant in support of the opposite view are factually distinguishable or fail to support the defendant's position.[61]

59. *Id.* at 184.

60. *See, e.g. Earwood v. Norfolk Southern R.R. Co.,* 845 F.Supp. 880 (N.D.Ga.1993) ("The installation of the devices is the crucial event. . . . The Court holds that in this case federal funds had not participated 'in the installation of the devices' at the time of the accident, because the warning devices had not been installed; and therefore, state law is not pre-empted.") *Id.* at 887; *Carpenter v. Consolidated Rail Corp.,* 69 Ohio St.3d 259, 631 N.E.2d 607 (Ohio 1994) (referring to *Easterwood,* the court said, "Apparently, the court concluded that planning and preparation are insufficient to evoke preemption. Before a state law governing warning devices will be deemed preempted, federal funds must actually have been committed and spent, and the 'warning devices,' as defined in Sections 646.204(i) and (j), Title 23, C.F.R., must have been installed.") *Id.* at 610; *Southern Pacific Transp. Co. v. Builders Transp., Inc.,* No. CIV.A 90–3177, 1993 WL 185620, at *11–12 (E.D.La. May 25, 1993), *aff'd,* 48 F.3d 531 (5th Cir. 1995)("The clear effect of 23 CFR §§ 646.214(b)(3) and (4) and *Easterwood* is that state law governs the adequacy of grade crossing warning devices prior to any federally-funded installation of warning devices, and federal law governs after such installation."). *Cf., Michael v. Norfolk Southern Railway Co.,* 74 F.3d 271 (11th Cir.1996). In *Michael,* automatic gates had been installed at the crossing in question with the aid of federal funds. The plaintiff argued that the length of the gate arm was not in compliance with federal standards, and that a state tort law action for defective design of the gate was not pre-empted as a result of this non-conformity. The court agreed, holding that a state tort claim against a railroad for defective design of automatic gates installed with federal-aid funds would be pre-empted, but only if the railroad has complied with the federal regulations. Thus in *Michael,* the mere expenditure of federal funds on an upgrade project was not deemed sufficient to trigger pre-emption absent actual compliance with the federal standards for the configuration of the warning device.

61. *E.g.,* defendant cites *Hester v. CSX Transp., Inc.,* 61 F.3d 382 (5th Cir.1995), *cert. denied,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996). In *Hester,* the court first considered the *Easterwood* test, asking whether federal funds "participated" in the installation of "warning devices" at the crossing in question. The evidence showed that federal funds had in fact been approved and expended on installing several types of passive warning devices years before the Hesters' son's accident. Thus, *Hester* did not confront the issue presented in the instant case where the warning devices were not installed and operating until after the accident. The principal issue in *Hester,* which is not involved in the instant case, was whether, under 23 CFR § 646.214(b)(4), the appropriate authority had made a determination that the warning devices which had been installed were adequate. There was no evidence that such a determination had ever been made. The court reasoned that the use of federal funds presupposes that the Secretary approved and authorized their expenditure, which in turn presupposes that the Secretary determined that the safety devices installed were adequate. Hence, state law claims based on inadequate signalization were pre-empted. In its only reference to the issue presented in the instant case, the court in dicta contained in a footnote said, "Moreover, as our discussion below makes clear, the mere fact that a railroad has participated as a member of a diagnostic team to survey, rate, and rank grade crossings for future improvements is by itself insufficient to establish that federal funds participated in the improvement of the crossing; there must be an actual, authorized expenditure of federal funds in the installation or placement of safety devices at the particular crossing to trigger preemption." The court then cited *St Louis Southwestern R.R. Co. v. Malone, supra,* note 51, which held that completed installation is necessary to trigger pre-emption, suggesting that the court was focusing in on the result of installation and not just the process. Defendant also cites *Shots v. CSX Transp., Inc.,* 38 F.3d 304 (7th Cir.1994). In

¶ 30 In arriving at a decision for this case, we acknowledge that by virtue of the Supremacy Clause, we are bound by the decisions of the United States Supreme Court with respect to the federal Constitution and federal law, and we must pronounce rules of law that conform to extant Supreme Court jurisprudence.[62] We also recognize that nothing in the concept of supremacy or in any other principle of law requires subordination of state courts to the inferior federal courts.[63] Subject to decisions of the United States Supreme Court, state courts are free to promulgate judicial decisions grounded in their own interpretation of federal law.[64] In this respect, the circuit courts of appeals and the state appellate courts are "co-ordinate courts," all equally subject to the supervisory authority of the United States Supreme Court.[65] Nevertheless, while pronouncements on a federal-law question by an inferior federal court are not binding on us, we view them as highly persuasive.[66] Ordinarily, as a matter of comity, we follow Tenth Circuit jurisprudence on substantive federal law.[67] The voluntary deference we pay to our circuit's pronouncements prevents federal law from being dichotomized within the State of Oklahoma into different bodies of legal norms—that applied in Oklahoma courts and that which governs federal courts sitting within this state.[68] Our commitment to comity is founded on sound reasoning and we will not depart from it absent compelling reason. Such a reason exists where the Tenth Circuit interprets a Supreme Court decision in a way which we are convinced is erroneous and where to follow it would be to perpetuate error. Our independent obligation correctly to interpret Supreme Court decisions is of greater importance than the object, desirable as it is, of achieving harmony between state and federal courts within our state.

Shots, the crossing in question, like the crossing in Hester, was equipped with a passive warning device, the installation of which had been completed before the accident with the assistance of federal funds. The issue presented for the court was whether federal financial assistance alone pre-empts state tort law. Like Hester, the warning devices in Shots came under the purview of § 646.214(b)(4), and the court held that in the absence of an express approval of the type of device installed at a crossing, the regulation does not apply and a state claim is not pre-empted. The mere authorization of federal funds does not presuppose, contrary to what the court said in Hester, that the Secretary has determined that the devices installed were adequate to meet federal safety standards. Thus, the court in Shots did not consider the issue with which we are confronted in the present case. Defendant also cites Elrod v. Burlington Northern R.R. Co., 68 F.3d 241 (8th Cir.1995). In Elrod, the federally-funded warning devices were installed and operational on the date of the accident. Referring to its decision in Malone, supra, note 51, holding that federal pre-emption occurs only when federally-funded warning devices are installed and operational, the court held that the facts in Elrod "are precisely the kind of facts that Malone requires for the triggering of federal preemption." Id. at 244. Thus, Elrod's holding and rationale are clearly contrary to the position put forward in this case by defendant.

**62.** United States v. Home Fed. S. & L. Ass'n of Tulsa, 1966 OK 135, ¶ 18, 418 P.2d 319, 325; McLin v. Trimble, 1990 OK 74, ¶ 3, n. 5, 795 P.2d 1035, 1045, n. 5 (Opala, V.C.J., dissenting).

**63.** A.L. Lockhart v. Fretwell, 506 U.S. 364, 376, 113 S.Ct. 838, 846, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) ("The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation."). See, also, Steffel v. Thompson, 415 U.S. 452, 482, n. 3, 94 S.Ct. 1209, 1227, n. 3, 39 L.Ed.2d 505 (1974) (Rehnquist, J., concurring); United States ex rel. Lawrence v. Woods, 432 F.2d 1072, 1076 (7th Cir.1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971).

**64.** ASARCO Inc. v. Kadish, 490 U.S. 605, 617, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696 (1989) ("Indeed, inferior federal courts are not required to exist under Article III, and the Supremacy Clause explicitly states that 'the Judges in every State shall be bound' by federal law. U.S. Const., Art. VI, cl. 2.").

**65.** Iowa Nat. Bank v. Stewart et al. and Six Other Cases, 214 Iowa 1229, 232 N.W. 445, 454 (1930), rev'd on other grounds, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931).

**66.** Dority v. Green Country Casting Corp., 1986 OK 67, ¶ 11, n. 24, 727 P.2d 1355, 1359, n. 24; Phillips v. Williams, 1980 OK 25, ¶ 10, 608 P.2d 1131, 1135, cert. denied, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

**67.** McLin v. Trimble, supra, note 62 at ¶ 12, n. 17, at 1047, n. 17 (Opala, V.C.J., dissenting).

**68.** Id.

¶ 31 Such is the situation with which we are faced here. Our analysis of *Easterwood*, of FRSA, of the relevant regulations, and of the cases interpreting them leads us *to hold that federal pre-emption occurs only when federally-funded warning devices, the configuration of which is determined pursuant to the criteria set forth in 23 CFR §§ 646.214(b)(3) or (4), are installed and become operational.* The reasoning expressed by the 7th and 8th Circuits is persuasive. We do not believe that Congress intended for a no man's land to exist at grade crossings for an indefinite amount of time, during which the public is protected neither by the federally *mandated* or *approved* warning devices nor by judicial recourse for injuries sustained by their absence.[69] The dual Congressional purposes of promoting railroad safety while putting an end to non-uniform state regulation of railroads is not harmed by our decision today. There is no conflicting regulatory effect of entertaining a common-law negligence claim if the federally-required warning devices are not present. It is compliance with the regulatory standard that establishes that the railroad has exercised due care and supports the pre-emption of the duty of care imposed by state negligence law.

¶ 32 We are not unmindful that with our adoption of the 7th and 8th Circuits' reasoning, there will be a gulf on this federal-law question between federal and state courts in Oklahoma. We have faith that the Supreme Court will soon see fit to settle this serious inter-circuit conflict.

69. *Cf. Medtronic, Inc. v. Lohr, supra*, note 13, in which the United States Supreme Court refused to pre-empt all common-law causes of action under the Medical Device Amendments of 1976 because to do so would "have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order 'to provide for the safety and effectiveness of medical devices intended for human use.'" *Id.* at 470, 487, 116 S.Ct., at 2251.

70. Title 12 O.S.1991 § 651 provides in pertinent part:

"A new trial is a reexamination in the same court, of an issue of fact, or of law, either or

## IV

## A NEW TRIAL IS NOT WARRANTED WHERE THE EVIDENCE IS OVERWHELMING THAT THE DECEASED'S NEGLIGENCE WAS THE PROXIMATE CAUSE OF THE ACCIDENT.

¶ 33 Certiorari disposition of this case does not rest solely on our holding with regard to pre-emption. Because this case comes to us for corrective relief from the decision by the Court of Civil Appeals affirming the trial court's denial of plaintiff's motion for a new trial, this court must also consider the standards of certiorari review.

¶ 34 The statutory grounds upon which a party may seek a new trial are set forth in Title 12 O.S.1991 § 651.[70] Under that section, a decision by the trial court which is contrary to law requires a new trial, but only if the decision *materially affected the substantial rights* of the aggrieved party. Reviewing erroneous decisions in the context of a motion for a new trial, this court has stated the test in several ways. In a case involving the giving of improper jury instructions, the court stated that the test is whether there is a probability that jurors were misled thereby and reached a different result from that which they would have reached but for the error.[71] In a case involving the improper exclusion of evidence, we held that a judgment will not be set aside or a new trial granted on appeal unless it appears from the entire record that the error complained of probably resulted in a miscarriage of justice or constituted a substantial violation of a constitutional or statutory right.[72] The court

both, after a verdict by a jury, the approval of the report of a referee, or a decision by the court. The former verdict, report or decision shall be vacated, and a new trial granted, on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of such party:

. . .

Sixth. That the verdict, report or decision is *not sustained by sufficient evidence, or is contrary to law . . . .*"

71. *Woodall v. Chandler Material Co.*, 1986 OK 4, ¶ 13, 716 P.2d 652, 654.

72. *Byrd v. McKoy*, 183 Okla. 209, 81 P.2d 315, 317.

has also held that it is reversible error for a trial court to grant a new trial when the decision complained of was not prejudicial to the outcome of the trial.[73]

■ ¶ 35 Every trial judge's decision comes to a court of review clothed with a presumption of correctness. If supported by law and evidence, the nisi prius judgment will be affirmed even if it was based on an incorrect theory and neither party tendered below an appropriate analysis of the applicable law.[74]

■ ¶ 36 We must then consider, based on the entire record available to us in this case, whether a new trial is required so that plaintiff may present her theory that her husband's accident was the result of the defendant's breach of a duty to install automatic gates at the Adair crossing. Three evidentiary elements are essential to a prima facie case of negligence: (1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure properly to exercise or perform

that duty, and (3) an injury to plaintiff proximately caused by the defendant's breach of that duty.[75] Assuming, arguendo, that plaintiff could establish the elements of duty and breach of duty, plaintiff must still prove that the absence of an automatic gate was the proximate cause of Mr. Akin's accident.

■ ¶ 37 Generally, the proximate cause of an injury in a negligence case is for the jury to determine.[76] It becomes a question of law for the court only when there is no evidence from which a jury could reasonably find a causal nexus between the defendant's alleged negligent act and the injury.[77] Sufficiency of the evidence, the legal standard which determines whether a case may go to the jury, also is a question of law for the court.[78]

■ ¶ 38 The proximate cause [79] of an injury is the efficient cause, i.e. the agency which produces the effect. It must be that cause which sets in motion the chain of circumstances leading to the injury. This causal connection may be broken by the occurrence of what is known in Oklahoma jurisprudence as a supervening cause.[80] A su-

---

**73.** *Montgomery v. Murray*, 1970 OK 226, ¶ 20, 481 P.2d 755, 761 (improper questioning of plaintiff by defense counsel). See also, *Badgwell v. Lair*, 1958 OK 122, ¶ 8, 325 P.2d 968, 971 ("Probability of a change in the outcome of the lawsuit is the test of prejudice this court has long employed in alleged errors of practice and procedure.").

**74.** *Lockhart v. Loosen*, 1997 OK 103, ¶ 3, 943 P.2d 1074, 1082 (Opala, J., dissenting). This court will affirm a correct judgment on any applicable theory. *Bivins v. State ex rel. Oklahoma Memorial Hosp.*, 1996 OK 5, n. 40, 917 P.2d 456, 465, n. 40; *Matter of Estate of Maheras*, 1995 OK 40, ¶ 7, 897 P.2d 268, 272 n. 6; *Wright v. Grove Sun Newspaper Corp., Inc.*, 1994 OK 37, ¶ 18, 873 P.2d 983, 992; *Messenger v. Messenger*, 1992 OK 27, n. 52, 827 P.2d 865, 874, n. 52; *Willis v. Nowata Land and Cattle Co.*, 1989 OK 169, ¶ 13, 789 P.2d 1282, 1286–1287; *Davidson v. Gregory*, 1989 OK 87, n. 23, 780 P.2d 679, 685 n. 23; *Benham v. Keller*, 1983 OK 68, ¶ 5, 673 P.2d 152, 154; *Utica Nat'l Bank and Trust v. Associated Producers, Co.*, 1980 OK 172, ¶ 20, 622 P.2d 1061, 1066; *Thompson v. Inman*, 1971 OK 32, ¶ 38, 482 P.2d 927, 937; *Holloway v. Ward*, 84 Okl. 247, 203 P. 217, 219 (1921).

**75.** *Jackson v. Jones*, 1995 OK 131, ¶ 5, 907 P.2d 1067, 1071–1072.

**76.** *McKellips v. St. Francis Hosp. Inc.*, 1987 OK 69, ¶ 9, 741 P.2d 467, 471; *Prest–O–Lite Co., Inc., v. Howery*, 169 Okla. 408, 37 P.2d 303, 305 (1934).

**77.** *Jackson, supra*, note 75 at ¶ 8, at 1073.

**78.** *McKellips, supra*, note 76 at ¶ 10, at 471.

**79.** Proximate cause consists of two complimentary concepts: cause in fact and legal causation. Cause in fact refers to everything which contributed to a result, which would not have occurred without those things. Obviously, without some limiting principal, an infinite number of factual causes could be traced backwards through time for any given event. The concept of legal causation has developed as that limiting principal. Legal causation requires a judgment as to whether liability should be imposed as a matter of law where cause in fact has been established. It is a determination based on both common sense and policy arguments. *See*, W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 41, at 263 (5th ed.1984).

**80.** The term "supervening" cause, as used in Oklahoma decisions, is synonymous with the term "superseding" cause, the term used in the RESTATEMENT (SECOND) TORTS §§ 440 et seq. to mean the type of intervening event, which in a negligence case, severs the causal chain. *See, Jackson, supra*, note 16. *See also*, William J. McNichols, *The Relevance of the Plaintiff's Misconduct in Strict Tort Products Liability, the Advent of Comparative Responsibility, and the Proposed Restatement (Third) of Torts*, 47 OKLA. L Rev. 201, 270, n. 307 (Summer 1994).

pervening cause is a new, independent and efficient cause of the injury which was neither anticipated nor reasonably foreseeable.[81] In other words, if the negligence complained of merely affords an opportunity that makes the injury possible and a subsequent independent act causes that injury, the opportunity is not the proximate cause of the injury.[82]

¶ 39 Plaintiff contends the cause of Mr. Akin's accident was the absence of an automatic gate at the Adair crossing. We disagree, finding the record devoid of evidence to support the existence of an efficient causal link between the absence of an automatic gate and Mr. Akin's accident.

¶ 40 The duty of a motorist approaching a grade crossing is set forth in Title 47 O.S.1991 § 11–701(a)(1) and (2) as follows:

"(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:

(1) A clearly-visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

(2) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train . . . ."

We have held that the failure to conform to the requirements of this statute is negligence per se.[83] A motorist nearing a railroad crossing simply must yield the right-of-way to an approaching train, and the operator of

the train can assume the vehicle will obey the law.[84]

¶ 41 In *Hamilton v. Allen*,[85] the plaintiff approached the crossing in question, which was equipped with crossbucks, flashers, gates, and bells. The flashers were on and the gates were down. Two other vehicles were stopped ahead of him. Plaintiff stopped briefly, then pulled out into the approaching lane of traffic, and drove past the two stopped cars and around the gates, where he passed over the siding track and collided with a train on the mainline track. It was noted that plaintiff had a wide-angled view of the approaching train. The court held that plaintiff's failure to obey the statute and heed the warnings broke the causal chain and were the proximate cause of his injuries.[86]

¶ 42 In arriving at its decision in *Hamilton*, the court relied upon the Texas case of *Snodgrass v. Ft. Worth & Denver R.R. Co.*,[87] which involved a statute identical to that of Oklahoma. It required a vehicle to stop at a crossing in the presence of flashing lights or a lowered gate. In *Snodgrass*, flashing lights were operating at the crossing in question as the plaintiff approached it. Plaintiff slowed down but did not stop and was hit by the train as he crossed the tracks. Plaintiff testified that he saw the lights flashing. After quoting the Texas statute requiring a motorist to stop at a crossing in the presence of flashing lights or lowered gates, the court held that plaintiff was "guilty of negligence which was a proximate cause as a matter of law." [88]

¶ 43 Our review of the record in the case before us compels us to conclude, as we did in *Hamilton* and as did the court in *Snod-*

---

81. See, Jackson, supra, note 75 at ¶ 9, at 1073. A true supervening cause will operate effectively to insulate the original actor from liability. A three-prong test is applied to determine whether an intervening event is a supervening cause. It must be: (1) independent from the original negligent act, (2) adequate in itself to bring about the relevant injury, and (3) reasonably unforeseeable. *Minor v. Zidell Trust*, 1980 OK 144, ¶ 7, 618 P.2d 392, 394; *Thompson v. Presbyterian Hospital, Inc.*, 1982 OK 87, ¶ 15, 652 P.2d 260, 264.

82. *Pepsi–Cola Bottling Co. of Tulsa, Oklahoma v. Von Brady*, 1963 OK 236, ¶ 17, 386 P.2d 993, 996–997.

83. *Hamilton v. Allen*, 1993 OK 46, ¶ 9, 852 P.2d 697, 699.

84. *Id.* at ¶ 13, at 700; *Jester v. St. Louis–San Francisco R.R. Co.*, 1965 OK 180, ¶ 14, 413 P.2d 539, 542.

85. *Hamilton, supra*, note 83.

86. *Id.* at 700.

87. 441 S.W.2d 670 (Tex.Civ.App.1969).

88. *Id.* at 672.

*grass*, that Mr. Akin's failure to stop at the crossing in the presence of discernible warnings was *the supervening*, and *therefore*, *proximate cause of his death.* In short, even if the railroad's failure to erect at the Adair crossing an automatic gate could have been shown to be a breach of its common-law duty of care, the nisi prius exclusion of that proof from trial by the trial court's summary ruling (on pre-emption) need not be treated as more than harmless error. This is so because Mr. Akin's action in entering the crossing, as conclusively established by the record, constitutes a supervening act of negligence which insulates the railroad from the legal consequences of its own lack of due care, if any.[89]

¶ 44 The evidence produced at the trial informs us that Mr. Akin was familiar with the Adair crossing. He had crossed it many times, including at least once several days earlier. Although it was not yet daybreak when the accident occurred, visibility at the time was clear and the weather was dry. The train was blowing its whistle as it approached the Adair crossing and its headlight was on. Photographs and a video admitted in evidence show nothing obstructing the view to the south of a person traveling, as Mr. Akin was, in a westerly direction. There was testimony that the flashing lights of the existing grade crossing warning device could be seen by a person approaching the crossing from the east (heading west) for five or six blocks from the crossing and that they were flashing as Mr. Akin approached the crossing. No other vehicles were approaching the crossing at the time of the accident. Mr. Akin did not alter the speed of his car as he entered the crossing. The truck's side windows were tinted, but the windshield was free of tint. Mr. Akin is believed to have had his windows rolled up and the radio playing at a moderate level.

■ %¶ 45 We cannot know why Mr. Akin did not see, ignored, or otherwise failed to perceive the numerous warnings of the presence of a train that morning; nor will we, in the process of deciding if a new trial should be granted, indulge in speculating whether Mr. Akin's behavior would have been different had he been confronted by an automatic gate instead of flashing lights.[90] The consequences were catastrophic for him and his loved ones; this court is saddened by their loss. But it is our duty to be governed by the rule of law and not by our sympathies. That this accident was not caused by the absence of an automatic gate is the only legal conclusion to be drawn. On this record, it would be an exercise in futility to grant plaintiff a new trial.

## V

## SUMMARY

¶ 46 This case presents an issue of national importance. It calls upon us to perform an obligation under the United States Constitution to apply federal law according to our understanding of the United States Supreme Court jurisprudence in the face of inter-circuit conflict over the meaning and effect of the ruling precedent. We discharge this duty by holding that federal law does not pre-empt state tort law in the area of inadequate signalization at railroad grade crossings unless federally funded warning devices have been installed and are operating. Nevertheless, we decline to remand this cause for a new trial because, on the record before us, plaintiff cannot establish that the railroad's negligence was the proximate cause of Mr. Akin's death.

¶ 47 On certiorari granted upon the plaintiff's petition, the Court of Civil Appeals' opinion is vacated; the trial court's judgment on jury verdict is affirmed.

¶ 48 LAVENDER, SIMMS, HARGRAVE, OPALA, and ALMA WILSON, JJ., concur.

¶ 49 HODGES, J., concurs in part and dissents in part.

**89.** *See, Minor v. Zidell Trust, supra,* note 81; *Thompson v. Presbyterian Hospital, Inc., supra,* note 81.

**90.** *See, McKellips, supra,* note 76 at ¶ 11, at 471; *Hardy v. Southwestern Bell Telephone Co.,* 1996 OK 4, ¶ 10, 910 P.2d 1024, 1027; *Butler v. Oklahoma City Public School System,* 1994 OK CIV APP 22, ¶ 8, 871 P.2d 444, 446. Even an automatic gate is no assurance that a motorist will stop at a railroad crossing. *See, Hamilton v. Allen, supra,* note 83.

¶ 50  SUMMERS, V.C.J., and WATT, J., concur in Parts I, II, and III and dissent from Part IV.

¶ 51  KAUGER, C.J., recused.

